In re **BADGER FREIGHTWAYS, INC., Debtor.**

**BADGER FREIGHTWAYS, INC., Plaintiff,**

v.

**CONTINENTAL ILLINOIS NATIONAL BANK AND TRUST COMPANY OF CHICAGO, Frank Slykas and the United States of America, Defendant.**

**Bankruptcy No. 82 B 13999.
Adv. No. 88 A 0783.**

United States Bankruptcy Court,
N.D. Illinois, E.D.

Nov. 2, 1989.

Gregg E. Szilagyi, Holleb & Coff, Chicago, Ill., for plaintiff.

David S. Newman, Trial Atty., Tax Div., U.S. Dept. of Justice, Washington, D.C., for U.S.

Timothy A. French, Neal Gerber Eisenberg & Lurie, Chicago, Ill., for Continental Bank.

Frank Slykas, Hollister, Cal., for defendant Frank Slykas.

## MEMORANDUM OPINION ON CONTINENTAL'S MOTION TO DISMISS

JACK B. SCHMETTERER, Bankruptcy Judge.

Badger Freightways, Inc. ("Debtor") is a debtor-in-possession under Chapter 11 of the Bankruptcy Code. Badger filed this five count Adversary Complaint against Continental Illinois National Bank and Trust Company of Chicago ("Continental"), Frank Slykas, and the United States of America. Continental moved to dismiss all five counts for asserted failure to state a claim upon which relief can be granted. Badger subsequently moved to amend Count IV of its complaint. Badger's motion was granted and it filed an amended complaint (the "First Amended Complaint"). Continental then moved to dismiss amended Count IV and renewed its motion to dismiss Badger's other four counts. For reasons stated below, Continental's motion is granted as to all five counts.

### FACTS AS ALLEGED IN BADGER'S COMPLAINT

When ruling on a motion to dismiss for failure to state a claim, the Court must presume that all well pleaded facts alleged in the complaint are true. *Gray v. County of Dane*, 854 F.2d 179 (7th Cir.1988). Badger's complaint, in pertinent part, alleges the following facts:

Badger is a Wisconsin corporation engaged in the trucking business, primarily in Illinois and Wisconsin. On January 1, 1979 Nicholas Karzen acquired ownership of Badger's outstanding stock from his father's estate. In late 1979 or early 1980, Continental became Badger's "primary bank." Debtor's First Amended Complaint ¶ 8.

In late 1980 Badger fell behind in the payment of its payroll taxes. This eventually resulted in the Internal Revenue Service ("IRS") filing notice of federal tax liens in April of 1981. Badger eventually reached an agreement with the IRS under

which it was obligated to pay $40,000 per month on its past taxes in addition to making its current payments in a timely manner.

Sometime in 1980 or 1981 Michael Thometz and Frank Slykas were hired by Badger on Continental's recommendation. Slykas had been associated with Thometz during other employment. *Id.* at 9. Thometz, a former employee of Continental, became the chief operating officer of Badger. Slykas was hired as chief financial manager and controller and was responsible for the financial management of Badger, including bookkeeping, cash management, and maintaining Badger's relationship with Continental. Slykas had a "close relationship" with Sanford Wax, the Continental employee who subsequently became responsible for Badger's account at Continental. *Id.* Continental then "told" Mr. Karzen that he "should" allow Thometz and Slykas to run debtor and "should" not involve himself in day to day management. Mr. Karzen therefore delegated authority for day-to-day operations to those persons for as long as they stayed with the company. *Id.* at ¶ 10.

During 1981 and early 1982, Badger occasionally wrote overdrafts which were routinely honored by Continental. Beginning in February of 1982 Badger's accounts were continuously overdrawn. In March of 1982, "Continental, instead of demanding that the overdraft be covered, insisted that Badger enter into a 'restructuring' of Badger's indebtedness to [Continental]." *Id.* at ¶ 14. The restructuring was orally negotiated between Slykas and Wax and a note for $1,306,625 was executed on June 4, 1982.

In the spring and summer of 1982, Thometz and Slykas "each engaged in conduct detrimental to Badger, contrary to the instructions of Karzen and inconsistent with the professional skills and standards which had led to their being hired." *Id.* at ¶ 18. This included Slykas' failure to have proper

accounting records kept or to make income tax withholding payments on time.

In August of 1982 Thometz was fired for cause. Slykas was on vacation at the time of Thometz' firing. Upon returning, Slykas left his position without notice. "At all relevant time, commencing no later than the spring of 1982 and continuing until he left Badger's employ, Slykas acted on behalf of, for the benefit of, and as the agent of Continental in regard to the financial affairs of Badger." *Id.* at ¶ 24.

On October 6, 1982 Continental demanded immediate payment of its loans to Badger. Shortly thereafter Continental set off all funds in Badger's accounts. Continental also set off all payments from Badger's customers received in Badger's lockbox at Continental. As a "direct consequence" of these actions, on October 18, 1982 Badger filed a voluntary petition in bankruptcy under Chapter 11 of the Bankruptcy Code. *Id.* at ¶ 23. Badger now seeks substantial monetary and other relief under various theories described hereinbelow.[1]

## JURISDICTION

Badger's complaint asserts that its adversary complaint is a core proceeding under § 157(b)(2) and therefore does not address whether it would consent under § 157(c)(2) to this court entering final orders in "related to" proceedings. Badger's complaint asserts three equitable subordination counts. These counts all arise under 11 U.S.C. § 510(c) and involve a proceeding to determine the priority of liens. They are therefore core matters within § 157(b)(2)(K). Count IV, a preference action, is also core under § 157(b)(2)(F). Count V, however, seeks damages for breach of asserted duty, and is only "related to" Badger's Title 11 proceedings. This Court therefore cannot enter a final adjudication. However, since the order entered presently is without prejudice to filing of

---

1. Badger's First Amended Complaint also names the United States and Slykas as defendants. The United States is named in Count II because Badger seeks in part a declaration that payments received by the IRS "from and after April, 1982 should be applied to current 1982 payroll tax obligations." Count III seeks a ruling that Slykas and Continental should be jointly and severally liable for the damages caused by their breach of duties.

an amended complaint, there is no final adjudication on that Count.

## ANALYSIS

Notice pleading filed under the Federal Rules of Civil Procedure should be liberally construed. *Sutliff, Inc. v. Donovan Companies, Inc.*, 727 F.2d 648, 653 (7th Cir. 1984). "A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 47–48, 78 S.Ct. 99, 102–03, 2 L.Ed.2d 80 (1957). The Seventh Circuit has emphasized, however, that "[d]espite their liberality on pleading matters, ... the federal rules still require that a complaint allege facts that, if proven, would provide an adequate basis for each claim." *Gray*, 854 F.2d at 182. *See also Sutliff*, 727 F.2d at 654 (noting that the standard in *Conley* "has never been taken literally" and that the complaint must contain either direct allegations or allegations from which an inference may fairly be drawn that evidence on the material points will be introduced at trial) (citations omitted). It is also well established that alleging mere legal conclusions, without a factual predicate, is inadequate to state a claim for relief. *Briscoe v. LaHue*, 663 F.2d 713, 723 (7th Cir.1981), *aff'd*, 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983).

As discussed below, a key component of Badger's complaint is its conclusory assertion that Slykas, although employed as Badger's chief financial officer, was covertly working as Continental's agent and managing Badger for the benefit of Continental, not Badger's shareholders. Such a bold assertion must be supported in the pleading by the details upon which it is based. Such details have not yet been pleaded.

## A.  COUNTS I–III

Counts I–III of Badger's complaint are stated in the alternative and each seeks to have Continental's "interest"[2] subordinated to a specific category of claims. Count I asserts that Continental's "interest" should be subordinated to all allowed claims, Count II to the claims of the Internal Revenue Service, and Count III to the claims of Badger's employees.

### 1.  Laches

Continental's initial argument is that Badger's equitable subordination counts are barred by laches because those complaints were first filed about six years after Badger commenced its bankruptcy case. Continental concedes that there is no specific statute of limitations applicable to equitable subordination.

A statute of limitations bars a cause of action based solely on the passage of time. In contrast, the laches doctrine arises due to a change in the conditions of the parties. *Lingenfelter v. Keystone Consol. Industries, Inc.*, 691 F.2d 339, 340 (7th Cir.1982). In the simplest terms, if a plaintiff unjustifiably delays in pursuing a cause of action and the defendant is prejudiced by this delay, the laches doctrine bars the plaintiff from preceding. Accordingly, "[i]n order to support a defense of laches, there must be a showing of both a lack of diligence by the party against whom the defense is asserted and prejudice to the defending party." *Id.* *See also Smith v. City of Chicago*, 769 F.2d 408, 410 (7th Cir.1985) ("Laches may be invoked only when unreasonable delay and prejudice to the other party coincide.")

There is presently some uncertainty in the Seventh Circuit regarding the allocation of the burden of showing these two elements. It is clear that the plaintiff bears the burden of explaining the reason for the delay in pursuing the action. *Zelazny v. Lyng*, 853 F.2d 540, 541 (7th Cir. 1988); *Lingenfelter*, 691 F.2d at 340. Further, it is also clear that "[i]f the delay is inexcusable, then the defendant must show prejudice." *Lingenfelter*, 691 F.2d at 340. The unresolved issue is whether a presumption of prejudice arises if the plaintiff fails to explain the reason for delay. In *Zelazny*, the Seventh Circuit's most recent detailed discussion of the issue, the panel observed that there are at least two cases

**2.**  *See infra* at page 979 for a discussion of Continental's "interest".

in the Seventh Circuit declaring that such a presumption exists, but it also noted that in the most recent of these cases the panel proceeded to find actual prejudice to the defendant from the unjustified delay. *See Wilmes v. United States' Postal Service,* 810 F.2d 130, 134 (7th Cir.1987);[3] *Baker Mfg. Co. v. Whitewater Mfg. Co.,* 430 F.2d 1008, 1011–15 (7th Cir.1970), *cert. den.,* 401 U.S. 956, 91 S.Ct. 978, 28 L.Ed.2d 240 (1971). The *Zelazny* court then proceeded to explain that although it was not relying on a presumption of prejudice:

> [T]he plaintiff's inexcusable delay is relevant to whether actual prejudice has been shown. "If only a short period of time has elapsed since the accrual of the claim, the magnitude of prejudice require[d] before the suit should be barred is great, whereas if the delay is lengthy, prejudice is more likely to have occurred and less proof of prejudice will be required."

*Zelazny,* 853 F.2d at 543 *quoting Goodman v. McDonnell Douglas Corp.,* 606 F.2d 800, 807 (6th Cir.1979), *cert. den.,* 446 U.S. 913, 100 S.Ct. 1844, 64 L.Ed.2d 267 (1980).

■ Under this standard Continental's laches argument must be rejected at this stage of the proceeding. Continental asserts in its memorandum that it has been prejudiced in two ways by Badger's delay. First, Continental claims that it is no longer in possession of the relevant loan documents because they were transferred to the Federal Deposit Insurance Corporation in September of 1984. Second, Continental claims that the passage of time will make locating the witnesses difficult and that the impairment of the witnesses' memory will be significant.

Although the passage of six years is substantial, the existence of the forms of prejudice that Continental asserts involve questions of fact. In two recent Seventh Circuit opinions, for example, the impact of the delay on the memory of key witnesses was established by affidavit and other evidentiary means. *Wilmes,* 810 F.2d at 134; *Lingenfelter,* 691 F.2d at 342. No evidence of the asserted prejudice to Continental has yet been submitted. It has not been shown that the loan documents cannot be retrieved from the FDIC for use in this case, that important witnesses have been sought without avail, or that witnesses have impaired memory. Continental's motion to dismiss based on laches must therefore be denied.

#### 2. *Equitable Subordination*

Continental also contends that Badger has failed to allege facts supporting a claim for equitable subordination. Equitable subordination was originally a doctrine judicially created under the Bankruptcy Act of 1898. *See, e.g., Pepper v. Litton,* 308 U.S. 295, 307–08, 60 S.Ct. 238, 245–46, 84 L.Ed. 281 (1939). The doctrine was first codified in the Bankruptcy Reform Act of 1978. Subsection 510(c) of the Bankruptcy Code now provides:

> Notwithstanding subsections (a) and (b) ..., after notice and a hearing, the court may—
>
> (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or
>
> (2) order that any lien securing such a subordinated claim be transferred to the estate.

11 U.S.C. § 510(c). Although § 510(c) authorizes equitable subordination, it does not set forth any specific standards on which to determine when such subordination should be ordered. The legislative history accompanying § 510 indicates that courts should "follow existing case law" and that Congress wanted to "leave to the courts development of this principle." 124 Cong. Rec. H11,095 (daily ed. Sept. 28, 1978) (remarks of Rep. Edwards); *Id.,* at S17412 (daily ed. Oct. 6, 1978) (remarks of Sen. DeConcini), *reprinted in,* 1978 U.S.Code Cong. & Admin.News 5787, 6452, 6521. It is therefore

---

3. *Wilmes,* 810 F.2d at 134, quotes from *Lingenfelter,* 691 F.2d at 340, in support of such a presumption. *Lingenfelter,* however, merely observed that *Baker* had relied on a presumption and specifically stated that "[w]e need not analyze that issue in this case." Id.

necessary to turn to the case authorities to determine requirements of the equitable subordination doctrine.

Shortly before enactment of § 510(c), the Fifth Circuit in *In re Mobile Steel Co.*, 563 F.2d 692 (5th Cir.1977), collected and summarized authorities on the subject, and identified the necessary conditions of equitable subordination:

> [T]hree conditions must be satisfied before exercise of the power of equitable subordination is appropriate.
>
> (i) The claimant must have engaged in some type of inequitable conduct.
>
> (ii) The misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant.
>
> (iii) Equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Act.

*Id.*, at 699–700 (citations omitted). This 3–prong standard has been widely adopted by courts as the proper approach to follow in equitable subordination cases under § 510(c). *See, e.g., Koch Refining v. Farmers Union Central Exchange, Inc.*, 831 F.2d 1339, 1351 n. 13 (7th Cir.1987), *cert. den.*, 485 U.S. 906, 108 S.Ct. 1077, 99 L.Ed.2d 237 (1988) (noting that the test has been adopted by many courts as the standard formulation), *In re UNR Industries, Inc.*, 46 B.R. 25, 27 (Bankr.N.D.Ill.1984).

In order to satisfy the first prong of the *Mobile Steel* standard and survive Continental's motion to dismiss, Badger's complaint must allege facts demonstrating that Continental engaged in "inequitable conduct." The quality of conduct that will be deemed "inequitable" under § 510(c) depends on the nature of the legal relationship between the debtor and the party whose claim is subject to attack on equitable subordination grounds (hereinafter referred to as the "claimant").

In most equitable subordination cases, the claimant has owed a fiduciary obligation to the debtor and the debtor's creditors. Typically the claimant has been an officer or director of a corporate debtor, and often a controlling shareholder. The Supreme Court has stressed that the need

"to sift the circumstances surrounding any claim to see that injustice or unfairness is not done" is particularly acute when the claimant owes a fiduciary duty to the debtor. *Pepper*, 308 U.S. at 307, 60 S.Ct. at 246. In these circumstances the transaction giving rise to the contested claim must carry "the earmarks of an arm's length bargain," *id.* at 306, 60 S.Ct. at 245, and the claimant cannot "utilize his inside information and his strategic position for his own preferment." *Id.* at 311, 60 S.Ct. at 247. The Court also made clear that the fiduciary obligation "is designed for the protection of the entire community of interests in the corporation—creditors as well as stockholders." *Id.* at 307, 60 S.Ct. at 245.

If a claimant is not a fiduciary, its claim may still be equitably subordinated, but courts have required the claimant's conduct to be much more egregious. *In re Teltronics Services, Inc.*, 29 B.R. 139, 169 (Bankr. E.D.N.Y.1983). *See also In re N & D Properties, Inc.*, 799 F.2d 726, 731 (11th Cir.1986); *First Bank of Whiting v. Kham & Nate's Shoes, No. 2, Inc.*, 104 B.R. 909, 912–13 (N.D.Ill.1989); *In re Osborne*, 42 B.R. 988, 997 (W.D.Wisc.1984); *In re Pinetree Partners, Ltd.*, 87 B.R. 481, 488–89 (Bankr.N.D.Ohio 1988); *In re Scallywags, Inc.*, 84 B.R. 303, 309 (Bankr.D.Mass.1988); *In re Minnesota Kicks, Inc.*, 48 B.R. 93, 106 (Bankr.D.Minn.1985). In the lead case, the *Teltronics* court stated "[i]t is insufficient for the objectant in such cases merely to establish sharp dealing; rather, he must prove that the claimant is guilty of gross misconduct tantamount to fraud, overreaching or spoliation to the detriment of others." 29 B.R. at 169. Accordingly, the pivotal distinction between being a fiduciary and a non-fiduciary is that a non-fiduciary claimant can act strategically to protect its interest to the potential detriment of similarly situated claimants.

A financial lending institution such as Continental generally does not owe fiduciary obligations to the customers to whom it lends. *In re W.T. Grant Co.*, 699 F.2d 599, 609 (2d Cir.) *cert. den. sub. nom., Cosoff v. Rodman*, 464 U.S. 822, 104 S.Ct. 89, 78

L.Ed.2d 97 (1983); *Pinetree Partners,* 87 B.R. at 489. As the Seventh Circuit observed long ago:

> Aside from the provisions of the bankruptcy law, a creditor has a right to call a loan when due and to lawfully enforce collection. He may refuse an extension for any cause which may seem proper to him, or even without any cause. The law provides certain means for the enforcement of claims by creditors. The exercise of those rights is not inherently wrongful.

*In re Prima Co.,* 98 F.2d 952, 965 (7th Cir.), *cert. den.,* 305 U.S. 658, 59 S.Ct. 357, 83 L.Ed. 426 (1938).[4] *See also W.T. Grant,* 699 F.2d at 610 (apart from the constraints imposed by preference and fraudulent conveyance law, a creditor can generally use its bargaining position to improve the status of its existing claims).

An exception to this general rule exists when the lending institution exerts "dominion and control" over its customer. The rationale behind this exception is significant. If the lending institution usurps the power to make business decisions from the customer's board of directors and officers, then it must also undertake the fiduciary obligation that the officers and directors owe the corporation (and its creditors). This reasoning also dictates the scope of the term "control." What is required is operating control of the debtor's business, because only in that situation does a creditor assume the fiduciary duty owed by the officers and directors.

*In re American Lumber Co.,* 5 B.R. 470, 478 (D.Minn.1980), demonstrates this principle. There a bank was found to have controlled its customers when it had a legal right to a controlling interest in the company's stock, effectuated termination of all employees other than those necessary to liquidate the business, contracted for a security force to guard the company, determined which of the corporation's creditors would be paid, and told a corporate officer he could quit if he disapproved of the bank's conduct. *See also In re Clark Pipe & Supply Co.,* 870 F.2d 1022, 1030 (5th Cir.1989) (finding that debtor was mere instrumentality of a lender that had advanced only enough money to liquidate debtor's inventory but not pay other creditors, in order for that lender to convert the inventory in which it held a second priority security interest into receivables in which it held a first priority security interest). In contrast, standard loan agreement restrictions, close monitoring of the debtor's finances, and making business recommendations, even in the context of heated bargaining negotiations, have been held inadequate to establish the necessary control. *Ludwig Honold,* 46 B.R. at 129; *Teltronics Services,* 29 B.R. at 172. *See also Osborne,* 42 B.R. at 997 (no control where lender's status with debtor "approached" a joint venture, lender paid debtor's other creditors directly, and use of loan proceeds was subject to lender's direction).

■ In summary, to survive Continental's motion to dismiss Badger's complaint must allege facts showing either (1) that Continental exercised control over Badger such that it owed a fiduciary relationship to Badger and that its conduct breached this relationship, or (2) gross misconduct by Continental. Badger has thus far failed to allege facts satisfying either of these requirements. Therefore the complaint fails to allege "inequitable conduct" by Continental.

On this point, Badger first asserts that the flexible nature of the equitable subordination doctrine coupled with the preliminary stage of the proceedings make it unnecessary to allege that Continental is a fiduciary or to specify in detail Continental's egregious conduct because "the issue is ultimately one of proof, not pleading." Badger Br. at 13. Badger also asserts that most of the authority cited above is distinguishable because those decisions were rendered after evidentiary hearings on the merits.

---

**4.** *Prima* is an old case, but there is nothing to call its vitality into question. Indeed, other courts have recently cited it with approval. *See,* e.g., *Pinetree Partners,* 87 B.R. at 488; *In re Ludwig Honold Mfg., Co.,* 46 B.R. 125, 128 (Bankr.E.D.Pa.1985).

Badger's position is incorrect. The authorities construing equitable subordination distinguished between conduct warranting subordination based on the claimant's relationship to the debtor. To state a claim for this form of relief, Badger must therefore allege facts which demonstrate the existence of some form of relationship and the corresponding level of misconduct by Continental. The fact that the cases establishing this distinction involved issues resolved after hearings on the merits does not distinguish them. They demonstrate what facts must be alleged and then eventually proven to prevail under § 510(c).

Badger next argues that it has adequately alleged that Continental controlled it. Essentially it asserts that Continental operated Badger through Thometz and Slykas who although ostensibly acting as Badger's chief operating and financial officers, were actually serving as Continental's agents and "act[ed] in concert with Continental to improve and protect the position of Continental and to assume control of Badger." First Amended Complaint ¶ 25.

Badger pleads little in the way of factual allegations to support its legal assertion that Thometz and Slykas were Continental's agents. All that Badger alleges is that (1) Thometz and Slykas were hired on Continental's recommendation; (2) Thometz was a former employee of Continental and Slykas had a "close relationship" with a Continental employee; (3) Badger's sole shareholder turned over management to Thometz and Slykas on Continental's recommendation; (4) Slykas, "who purported to be acting on behalf of Badger," agreed to the restructuring which did not provide any additional funds to Badger, but benefited only Continental vis-a-vis other creditors; and (5) Slykas failed to make payroll payments to the IRS and Continental had actual and imputed knowledge of this.

Viewing these allegations in the light most favorable to Badger, as this court must, they show only that Slykas was hired on Continental's recommendation and later entered into a deal with a friend at Continental that converted Continental's unsecured debt into secured debt to the detriment of Badger's other creditors. These allegations suggest that Continental benefited from one deal that was potentially detrimental to Badger's other creditors, but not that it had on-going operating control over Badger through Slykas and Thometz. A necessary link in Badger's apparent theory is that Continental had some arrangement with Slykas and Thometz under which Continental effectively managed Badger. Badger, however, alleges only the conclusion that these two "acted in concert with Continental ... to assume control over Badger." There is nothing alleged that indicates how the purported relationship between Badger's two officers and Continental was formed, the terms of the purported arrangement, the circumstances that motivated Thometz and Slykas to serve in such capacity, any details as to what they did, or how Continental controlled what they did.

Without factual allegations showing the existence of an arrangement to control Badger, it is clear that Continental's recommendation of these two men and their subsequent management of Badger does not by itself establish control and dominion. The Seventh Circuit in *Prima Co.* addressed an analogous situation. There the Prima company was experiencing financial difficulties when one of its banks, Harris Trust & Savings Bank ("Harris"), recommended that it hire a man named Skinner to manage the company. Skinner was hired and his employment contract contained a provision permitting either him or the company the right to terminate the contract, subject to Harris' approval. The trustee later argued that Harris, through Prima's hiring of Skinner, exercised dominion and control over the company through Skinner. The trustee specifically argued that Prima only hired Skinner because it feared that otherwise Harris would call its loans.

The Seventh Circuit rejected this argument, stating that "[n]o doubt the debtor, because of its inability to meet its maturing obligations, acquiesced in Harris' recommendations, but this we think is not sufficient to constitute domination to its will." 98 F.2d at 965. The court also rejected the

Trustee's argument that Harris' right to approve any effort to terminate Skinner's employment contract demonstrated that Skinner served as the bank's agent.

Having failed adequately to allege facts demonstrating that Continental owed a fiduciary obligation to it, Badger must allege gross misconduct by Continental in order to set forth a cause of action for equitable subordination. As previously noted, this standard requires the objecting party to prove ultimately that the claimant is guilty of behavior "tantamount to 'fraud, over-reaching or spoliation to the detriment of others.'" *Teltronics*, 29 B.R. at 169 (citation omitted).

*First Bank of Whiting v. Kham & Nate's Shoes, No. 2, Inc.*, 104 B.R. 909 (N.D.Ill.1989), a recent case in this district, illustrates the type of egregious conduct warranting equitable subordination of the claim of a non-fiduciary creditor. In that case the First Bank of Whiting which had previously issued unsecured letters of credit in favor of Kham & Nate's trade creditors, was approached by the corporation to arrange a $300,000 line of credit to meet its working capital needs. The bank agreed to extend the line of credit on condition that Kham & Nate's file in Bankruptcy under Chapter 11. Kham & Nate's complied and the Bankruptcy Court shortly thereafter issued an order granting the bank a lien under § 364(c)(1) on all of Kham & Nate's post-petition assets. Subsequently the bank extended approximately $100,000 under the line of credit, but this sum was predominately applied to repay the amounts drawn under the pre-petition letters of credit. Shortly thereafter the bank terminated the financing arrangement. It did this despite having induced Kham & Nate's to file under Chapter 11, and even though the debtor was not in default and there had been no material change in debtor's financial condition.

The district court ruled that the bank's actions supported a finding of gross misconduct. The court explained that the bank "acted inequitably by agreeing to extend a line of credit to [Kham & Nate's] on the pretense of assisting [its] reorganiza-tion when its true motivation was to secure its previously unsecured obligations." *Id.* at 914.

Badger's complaint does not allege facts establishing conduct by Continental sufficiently egregious to warrant equitable subordination. Essentially Badger alleges that: (1) Continental recommended Thometz and Slykas to Badger and upon their subsequent employment urged that operating control be given to them, (2) Continental routinely covered Badger's overdrafts and instead of demanding immediate payment, insisted on a restructuring under which the overdraft amount was evidenced by a note and secured under a security agreement that improved its position relative to other creditors, including the IRS, (3) Continental later demanded payment of its loans to Badger and set-off Badger's outstanding loans against funds in Badger's accounts and lock-box, (4) as a result of this Badger had to file for protection under Chapter 11.

At worst, Continental's conduct described thus far is that of a typical creditor protecting its interest. Arguably Continental was generous to its debtor, not egregious, in honoring the overdraft and not immediately calling for payment. Even if this was not so, the facts presently alleged do not show that it owed a duty to the IRS or other creditors and was not free to enter a deal to secure the Badger indebtedness. Finally, Continental's demand for payment of the loans and its assertion of set-off rights could (under facts presently pleaded) been legitimate exercises of its legal rights. Badger has therefore failed adequately to allege "inequitable conduct" on the part of Continental. Continental's motion to dismiss Counts I–III is granted.

As an alternative argument supporting its motion to dismiss counts I–III for failure to state a claim, Continental points out that Badger does not specifically allege that Continental has a "claim" against the bankruptcy estate. Rather Badger requests that this court enter an order "subordinating the *interests* claimed by Continental in the *funds taken from Badger*" to all allowed claims, to all claims of the IRS,

and to the allowed claims of Badger's employees respectively. (emphasis added).

The language of § 510(c) distinguishes between "claims" and "interests." Section 510(c) authorizes the subordination of one claim to another in appropriate circumstances, but not the subordination of a claim to an interest. 3 King, *Collier on Bankruptcy* ¶ 510.05 at 510–8 (15th ed. 1989).

Badger's First Amended Complaint appears to use the term "interest" in a more generic sense, to refer to the right to payment evidenced by the June 4, 1982 note and its accompanying security agreement. The complaint, however, does not allege any facts specifically addressing why this right to payment did not give rise to a "claim" by Continental within 11 U.S.C. § 101(4), or if it did, what happened to the claim causing Badger to now characterize Continental's original right to payment as an "interest" instead of a claim. The parties' memoranda addressing Continental's motion to dismiss give divergent explanations of what occurred, but most of the information supplied is not pleaded nor supported by affidavit. Therefore such argument of counsel does not comprise facts properly before the court at this stage of the proceeding. To state a claim for equitable subordination in its Second Amended Complaint, Badger must also address this deficiency.[5]

### 3. THE PREFERENCE COUNT

■ Count IV of Badger's complaint seeks to recover the money that was set-off and retained by Continental. Plaintiff's theory is that the security interest created under the "restructuring" of the overdraft was a preference under 11 U.S.C. § 547(b).[6] A transfer, which includes the creation of a new security interest, is only subject to attack as a preference if it occurs "on or within" 90 days before the day the bank-ruptcy petition is filed, unless the party to whom the transfer was made was an insider. 11 U.S.C. § 547(b)(4)(A). In that case, the preferential transfer may be set aside if it occurred within one year before the day the petition was filed. *Id.* at § 547(b)(4)(B).

The security interest granted to Continental pursuant to the restructuring is alleged to have occurred in June of 1982. Badger filed for bankruptcy on October 18, 1982. Accordingly, as Badger's memorandum recognizes, in order to state a cause of action under § 547(b) its complaint must allege facts demonstrating that Continental was an "insider" as that term is used in § 547(b)(4)(B).

The term "insider" is defined in 11 U.S.C. § 101(30):

"insider" includes—...

(B) if the debtor is a corporation—

  (i) director of the debtor;

  (ii) officer of the debtor;

  (iii) *person in control of the debtor....*

As the statutory language indicates, the list is not all inclusive. The legislative history explains that the term is defined in this open-ended manner "because it is not susceptible of precise specification." S.Rep. No. 95–989, 95th Cong. 2d Sess. 25, *reprinted in* 1978 U.S.Code Cong. & Admin.News at 5810. The legislative history also states:

An insider is one who has a *sufficiently close relationship* with the debtor that his conduct is made subject to closer scrutiny than those dealing at arm's length with the debtor. If the debtor is an individual, then a relative of the debtor, a partnership in which the debtor is a general partner, a general partner of the debtor, and a corporation controlled by the debtor are all insiders. *If the debtor is a corporation, then a controlling*

---

5. The Court takes judicial notice of this Court's Claim Register pertaining to the Badger bankruptcy. It shows that Continental Bank filed on January 15, 1988, its claim for $1,798,578 which was settled with leave of court on January 18, 1989 by reduction to $500,000. Whether that relates to the instant suit is not clear.

6. Continental also points out, and Badger concedes, that the operative version of § 547(b) is the version in effect prior to the 1984 Amendments. Badger must therefore allege that Continental had reasonable cause to believe that Badger was insolvent.

*person, a relative of a controlling person,* a partnership in which the debtor is a general partner, and a general partner of the debtor are all insiders.

*Id.* at 5810 (emphasis added).

Continental contends that the case authorities uniformly require that for a lender to be an "insider," it must have participatory control over the debtor. In effect Continental argues that the same definition of control utilized under § 510(c) should also apply in the preference context. *See In re EMB Associates, Inc.,* 92 B.R. 9, 15 (Bankr.R.I.1988) (applying § 101(30) definition of insider in analysis of whether a party was in control of the debtor for equitable subordination purposes). *Cf.* 3 King, *Collier on Bankruptcy,* ¶ 510.05 at 510–14 (15th ed. 1989) (noting that an insider within § 101(30) does not always owe a fiduciary duty to the corporation.) Badger asserts, based on the open-ended definition in § 101(30) and the legislative history, that a "sufficiently close relationship" is enough to establish that a creditor is an insider.

The distinction between the two arguments is subtle but significant. Under Continental's position, Badger must allege facts demonstrating that Continental had management control over Badger. As the discussion of control in the equitable subordination context indicates, Badger's factual allegations do not satisfy this test. Under Badger's position, however, this showing is not necessary. All that it must allege are facts demonstrating that Slykas and the Continental representative were sufficiently close that the restructuring was not negotiated on an arms-length basis. In other words, Continental would be an insider under the Badger theory if Slykas made a sweetheart deal to benefit Continental at the expense of other creditors even though Continental did not control Badger. Badger has made sufficient allegations to satisfy this test.

To resolve this issue and determine the proper scope of the term "insider," it is necessary to understand the rationale for distinguishing between so-called "insiders" and other creditors in § 547(b). The basic goals of § 547(b) are (1) to prevent a rush by creditors to dismantle the debtor, and (2) to promote the policy of equality of distribution between similarly situated creditors by preventing debtor from selecting certain creditors to favor by transfers of property on the eve of bankruptcy. Section 547(b) achieves those goals by authorizing the trustee to recover such transfers made within 90 days of when the bankruptcy petition was filed. Within this period, transfers satisfying the § 547(b) criteria (and not within a § 547(c) exception) are recoverable from the recipient, regardless of their relationship to the debtor. 11 U.S.C. § 547(b).

The prospect always exists that a debtor can plan around the fixed 90 day period. In the case of a corporate debtor, this is most likely to occur when the parties involved in operating the corporation are also creditors of the corporation. Such persons may be the ones who actually select the date for filing of a voluntary petition. In addition, such parties (1) have greater access to information about the financial condition of the corporation and are therefore better positioned to anticipate the occurrence of bankruptcy, and (2) have the power to influence substantially the corporation's decision to make a transfer to satisfy their claim. The Bankruptcy Code recognizes this prospect and combats it by extending the preference period for such insiders and specifically designating directors and officers as insiders.

To analyze whether a lending institution such as Continental should be deemed an insider, its situation should be compared to the corporate officer who is commonly recognized as an insider. A lending institution, like the officer, may anticipate earlier than other parties that the company is in substantial difficulty. Again like the officer, that institution may seek to protect its own self interest by attempting to arrange for a transfer from the debtor.

The perceived evil in the corporate officer situation is the assumption that the corporation does not undertake an independent review of whether the proposed transfer is in its best interest (those interests of

its shareholders, and if insolvent its creditors). Rather it performs the transfer merely because directed by the corporate officer who made the decision approving the transfer. The ability of corporate officers and directors to influence corporate decision-making was deemed sufficiently great to justify a *per se* rule that those parties are insiders. 11 U.S.C. § 101(30)(B)(i), (ii).

Applying this rationale to lending institutions, the key issue is whether the lending institution, like the corporate officer, is in a position to make the decision authorizing the transfer. The likelihood of damage to the interests of the debtor's creditors is most acute when the same party-in-interest is on both sides of the transaction resulting in the transfer. The implication of this premise is that if in the course of bargaining a bank merely exerts leverage in terms of threatening to assert its legal rights, this by itself is not enough to make it an insider.[7] The fact that a debtor has a weak bargaining position and few choices does not indicate that the other party is an insider as long as the bank cannot unilaterally implement the transfer in issue.

This reading is consistent with the structure of 11 U.S.C. § 101(30). As noted, "insider" is defined by a non-inclusive list of examples, but each involves either an officer or director, or person in a position to dictate corporate decision making. Indeed, the primary focus of case authorities on these issues has been on operating control. When describing the requisite level of influence the lender must have to be an insider, courts have used terminology such as having a "stranglehold" over the debtor, having "complete domination" of the debtor, rendering the debtor a "mere instrumentality or alter ego" of the lender or "powerless to act independently." *In re Belco*, 38 B.R. 525, 530 (Bankr.W.D.Okl. 1984); *In re Hartley*, 52 B.R. 679, 690 (Bankr.N.D.Ohio 1985). *See also, In re Technology for Energy Corp.*, 56 B.R. 307, 316 (Bankr.E.D.Tenn.1985) (approving settlement agreement because it was unlikely that debtor could show that the lender controlled either production or personnel decisions). To be considered an insider "the person must exercise sufficient authority over the corporate debtor so as to unqualifiably dictate corporate policy and the disposition of corporate assets." *In re Babcock Dairy Co. of Ohio, Inc.*, 70 B.R. 657, 661 (Bankr.N.D.Ohio 1986).

Further, the existence of arms-length bargaining is evidence that the lender was not an insider. *See Hartley*, 52 B.R. at 689 (holding that an individual did not control a bank in part because the parties dealt at arms-length in requiring certain collateral to be pledged); *Technology*, 56 B.R. at 316. A close relationship by itself is insufficient to make a bank an insider. As the court in *In re Huizar*, 71 B.R. 826, 832 (Bankr.W.D. Tex.1987), cogently explained:

[C]ourts which have considered the insider preference issue as between a debtor and a creditor-bank have adopted a view that a creditor-lending institution must be able to exercise a reasonable amount of debtor control without fear of being labelled an insider.... [T]o find the existence of an "insider" relationship between the creditor-bank and the Debtor for purposes of the insider preference provisions of the Bankruptcy Code, solely based upon the admitted personal relationship which had developed between the Debtor and the [bank president], would call into question virtually every lending transaction between a debtor and its long standing lending institution and would result in the unreasonable conclusion that borrowers could only deal with bankers that were not friendly or understanding.

Accordingly, Badger's allegations of an undefined "close relationship" are insufficient to plead that Continental was an insider.

---

7. *See, e.g., In re Schick Oil & Gas, Inc.*, 35 B.R. 282, 285 (Bankr.W.D.Okla.1983). The trustee asserted that dealings between the debtor and the bank were not at arms length because the debtor's financial position put it in an inferior bargaining position. The court rejected the trustee's assertion, stating "simply because the bank had financial power over the debtor does not make the bank an insider for that reason. The type of control alluded to by the trustee was an incident of their debtor-creditor relationship." Id. at 285 (citation omitted).

As discussed earlier, Badger has not alleged facts demonstrating the requisite level of operating control. Continental's motion to dismiss count IV of Badger's First Amended Complaint is therefore granted.

### C. COUNT V

■ The fifth count of Badger's complaint, labelled "Defendants' Breaches of Duties" repleads all previous factual allegations and adds that:

> As a result of Continental's conduct as alleged, Badger has been damaged in the amount to be determined by proof at trial in excess of $750,000.

This is plainly insufficient to state a claim for relief. It is so sparse that it fails to provide Continental with adequate notice of the legal theory upon which it relies. By reference to the caption, it is possible to discern that an alleged breach of some duty is involved, but there is no indication as to what duties Continental owed that it allegedly breached. Therefore, the motion to dismiss count V is also granted.

### CONCLUSION

Badger's pleading is presently inadequate. However, it may be that it can replead adequately. In the circumstances of this case it is appropriate to give Plaintiff another opportunity to plead after it has an adequate time to investigate further and take more discovery. Therefore it will be allowed to replead after several months.

The Court notes that Defendant Slykas appears to have been served with summons, but no appearance has been filed by him or by counsel on his behalf. Should that remain the fact thirty days after the Amended Complaint is served on him, the Court will entertain a motion to default him on the next court date set by separate order.