Frank J. KELLEY, Attorney General of the State of Michigan, ex rel., MICHIGAN NATURAL RESOURCES COMMISSION, Michigan Water Resources Commission, and David F. Hales, Director of the Michigan Department of Natural Resources, Plaintiffs,

v.

Lester TISCORNIA, James W. Tiscornia, Edward C. Tiscornia, Loren Gerber, Defendants,

and

MANUFACTURES NATIONAL BANK OF DETROIT, Defendant and Third–Party Plaintiff,

v.

UNITED STATES of America, Third–Party Defendant.

No. 5:90–CV–62.

United States District Court, W.D. Michigan, S.D.

Jan. 12, 1993.

Paul F. Novak, Frank J. Kelley, Atty. Gen., Environmental Protection Div., Lansing, MI, for plaintiff.

Jon R. Muth, Miller, Johnson, Snell & Cummiskey, Grand Rapids, MI, for defendants Tiscornias.

Robert P. Hurlbert, Dickinson, Wright, Moon, Van Dusen & Freeman, Bloomfield Hills, MI, Frederick J. Dindoffer, Bodman, Longley & Dahling, Detroit, MI, Kenneth T. Brooks, Dickinson, Wright, Moon, Van Dusen & Freeman, Lansing, MI, for Manufacturers Nat. Bank of Detroit.

Thomas H. Pacheco, U.S. Dept. of Justice, Environmental Defense Section, Land & Natural Resources Div., Washington, DC, Michael L. Shiparski, John A. Smietanka, U.S. Atty., Grand Rapids, MI, Leland S. Van Koten, U.S. Dept. of Justice, Torts Branch, Civ. Div., Washington, DC, for U.S.

## MEMORANDUM OPINION AND ORDER

McKEAGUE, District Judge.

This action is brought pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq*, and the Michigan Environmental Response Act ("MERA"), M.C.L.A. 299.601 *et seq*. The State is seeking compensation for expenses it incurred cleaning up two sites: the Auto Specialties Manufacturing Company ("AUSCO") facility located in St. Joseph, Michigan (the "St. Joseph Facility") and the facility located in Benton Harbor, Michigan (the "Riverside Facility)." Counts I and II of the complaint seek relief under CERCLA and allege that Manufacturers National Bank of Detroit ("MNB" or the "Bank") operated the sites during times when hazardous substances were released. Counts III and IV of the complaint seek relief under MERA and allege that the Bank owned or operated the sites at the time of disposal of a hazardous substance.

This matter is before the Court on cross-motions for summary judgment. Plaintiffs move for partial summary judgment as to

the liability of defendant MNB.[1] MNB also moves for summary judgment. The Court has reviewed the pleadings and exhibits, heard oral argument on October 26, 1992, and now finds the matter ready for disposition.

## FACTS

The commercial relationship between the Bank and AUSCO began in 1964. MNB president, Roland Mewhort, was a member of AUSCO's board from 1964 through 1978. Lester Tiscornia placed him on the board after he seized control of AUSCO, a feat Tiscornia accomplished with the financial assistance MNB provided during a family fight for control of the company. After Mewhort died, Jim Bunker, Senior Vice President at Manufacturers National Corporation, took a seat and served on the board until 1986.[2] The Board of Directors met once or twice a year and dealt primarily with pension and capital spending issues. The executive committee, which was comprised of inside directors and the plant operating staff, met more frequently and decided daily operational matters.

During this time, the Bank assigned two account officers, J.F. VanProoyer and Hugh Porter, to AUSCO. They kept the Bank's loan committee apprised of AUSCO's status. The communication from AUSCO to the Bank is reflected in various memoranda which have been provided to the Court. The Bank memoranda for AUSCO in the 1979–1985 era describe the operations of the St. Joseph foundry operations (Exhibit 379), criticize AUSCO's other lender, the Harris Bank, and discuss strategies to force Harris to share the risk or bow out (Exhibit S–2),[3] show the Bank knew of labor disputes and the terms under review in the labor negotiation process (Exhibits 382–384), and discuss AUSCO's default on its loan covenants (Exhibit 385).

In September of 1985, the issue of new financing arose. AUSCO presented a consolidation plan to the Bank during discussions of financing. The Bank opted to continue financing AUSCO and executed two loan agreements on September 15, 1985. A revolving line of credit and a liquidation facilities note were executed. The Bank included various provisions to enable it to monitor the finances of AUSCO. The agreement required daily reporting, prohibited outside financing, banned dividends and created a blanket lien on all machinery and equipment. The daily reporting mechanism, used in asset-based lending, authorized the Bank to monitor the cash proceeds from receivables against the outstanding loan on a daily basis.

In early 1986, Bank officers met with AUSCO officers on a more frequent basis to monitor AUSCO's adherence to the consolidation plan that came into existence during loan negotiations. David Day, a MNB employee, participated in monthly meetings with AUSCO. He expressed concerns as to the ability of the management at AUSCO to make the manpower reductions laid out in the consolidation plan. He also expressed concern because AUSCO failed to meet anticipated reductions in utility costs, maintenance costs, overhead costs, inventory, and shipping and freight costs, all of which were monitored by the Bank. On August 6, 1986, David Day and Hugh Porter met with James Tiscornia, head of operations at AUSCO, to discuss these concerns. The Bank's position at the meeting was that if it were to remain involved in financing, certain changes had to

---

1. The case has been bifurcated and at this time only liability issues are before the Court.

2. The State alleges in the complaint that these facts show that the Bank participated in the management and control of AUSCO. At oral argument, the State did not contest an award of summary judgment to the Bank with respect to actions of the Bank occurring prior to 1964 as well as after the time after Sachs was terminated, that is from June 30, 1988 to the present. The State reserved its right to seek contribution from the Bank for contamination that occurred during these periods in the event the Bank is found liable for the period of 1964 to 1988, and it is not possible to apportion when the contamination occurred. Such partial summary judgment was granted to the Bank on January 7, 1993.

3. Eventually, Harris Bank ceased providing credit to AUSCO and MNB became the sole lender.

be made. First, Lester Tiscornia[4] should be dropped from the payroll. Second, a turnaround specialist was needed to replace James Tiscornia. The Bank recommended Benjamin Sachs,[5] as well as another candidate, and indicated to James Tiscornia that Loren Gerber, Chief Financial Officer at AUSCO, was not acceptable to the Bank for this position.

AUSCO hired Sachs in September of 1986. Edward and Lester Tiscornia contacted the Bank during their negotiation with Sachs to question the Bank about whether they had to accept Sachs' terms.[6] Embree, a Bank representative, informed the Tiscornias that if outside management were not retained by AUSCO, the Bank would not continue to lend money to the company. The Tiscornias then requested that a $500,000 bonus provision for Sachs be financed by the Bank. Embree rejected the request. The parties eventually agreed to an incentification bonus, structured to provide compensation to Sachs based on his ability to reduce the debt owed to the Bank. The Bank financed this arrangement. Further, the Bank set the same date for termination on advances to AUSCO under the revolving line of credit as the expiration date of Sachs' contract.

As President and Chief Executive Officer of AUSCO, Sachs had responsibility for the day-to-day operations at AUSCO. In the winter of 1986–87, Sachs experienced management problems and he complained to the Bank. Loren Gerber and James Tiscornia testified in deposition that the Bank threatened to make management changes if they did not cooperate with Sachs. Sachs met with Bank representatives frequently during his tenure; over 100 conferences occurred from August of 1986 through June of 1988. There is no dispute that Sachs provided information to the Bank on a regular basis until he was fired by Lester Tiscornia on June 30, 1988.

4. Lester Tiscornia became semi-retired in 1975.

5. Sachs had a prior financial relationship with the Bank when he was President and CEO of Standard Tube of Detroit. Sachs had personally guaranteed debts to the Bank and after all debt had been repaid, the company went out of business.

## STANDARD OF REVIEW

Summary judgment is appropriate where no genuine issue of material fact exists so that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The court determines whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Of course, "inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 993, 8 L.Ed.2d 176 (1962)). The movant meets its initial burden "by showing—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324–25, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). At that point, the nonmovant "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(c).

## ANALYSIS

CERCLA liability attaches if each of the following elements is established:

(1) There is a release or threatened release of a hazardous substance;

(2) at a facility

(3) causing the plaintiff to incur response costs; and

(4) the defendant is a responsible party as defined in § 107(a).

42 U.S.C. § 9607(a); *United States v. Aceto Agricultural Chemicals Corp.*, 872 F.2d 1373 (8th Cir.1989).

6. According to James Tiscornia, Sachs used his relationship with the Bank as leverage during his contract negotiations with AUSCO. He told Tiscornia that he could get whatever contract terms he wanted because if he were not employed the Bank would call the loan.

■ Liability is strict, fault or state of mind is irrelevant. *United States v. Monsanto Co.*, 858 F.2d 160 (4th Cir.1988). Because the goals of CERCLA are remedial, the court is obligated to construe the statute's liability provision broadly to avoid frustrating its legislative purpose. *Anspec Co., Inc. v. Johnson Controls*, 922 F.2d 1240, 1247 (6th Cir.1991).[7]

At issue in this motion is the fourth element, whether the Bank is a responsible party.[8] Under 42 U.S.C. § 9607(a)(2), a responsible party is defined as:

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of, ...

Further, under the Act, an owner or operator is defined as "any person" and any person is defined as "an individual, firm, corporation, association, partnership, consortium, joint venture, commercial entity, United States government, state, municipality, commission, political subdivision of the state, or any interstate body." 42 U.S.C. § 9601(20)(A) and (21).

There are two time periods in question. The first period is from 1964 to August 6, 1986, during which representatives of the Bank were directors of the company. The second period is from August of 1986 through June 30, 1988, during which the work-out specialist recommended by the Bank actually managed the company. The Bank held the first mortgages on the property during both time periods.

■ CERCLA explicitly excludes from liability persons who "without participating in the management of a vessel or facility, hold indicia of ownership primarily to protect securing interests in the vessel or facility." 42 U.S.C. § 9607(a)(2). Accordingly, it is not enough that the Bank held first mortgages to impose liability on the Bank under CERCLA or MERA, and it is necessary to analyze the actual role played by the Bank in the management of the company during these periods.

In analyzing the participation by the Bank in the management of the company, it is also necessary to consider the lender liability rule issued by the EPA effective April 29, 1992, which expands upon the statutory exclusion, and reads as follows:

(1) Actions that are Participation in Management

Participation in management of a facility means ... actual participation in the management or operational affairs of the facility by the holder, and does not include the mere capacity to influence, or ability to influence, or the unexercised right to control facility operations. A holder is participating in management, while the borrower is still in possession of the vessel or facility encumbered by the security interest, only if the holder either;

(i) Exercises decisionmaking control over the borrower's environmental compliance such that the holder has undertaken responsibility for the borrower's hazardous substance handling or disposal practices; or

(ii) Exercises control at a level comparable to that of a manager of the borrower's enterprise, such that the holder has assumed or manifested responsibility for the overall management of the enterprise encompassing the day-

---

**7.** Apparently, the MERA violations alleged in the complaint are analyzed through CERCLA case law. Section 12(1) of MERA provides that a party is liable for the cost of remedial action and damages resulting from disposal of hazardous substances at a facility if the party is: (a) the owner or operator of the facility, (b) the owner or operator of the facility at the time of the disposal of a hazardous substance. M.C.L.A. 299.612.

The statute adds that "a commercial lending institution shall not be construed to be participating in the management of a facility by ex-

tending credit, providing financial advice, or supervising a plan to resolve financial difficulties for an owner ... if the actions ... do not suggest, condone, or encourage the treatment or handling of a hazardous substance by the owner that results in a release. 299.603(t)(i).

**8.** There is also argument presented on the first element; however it is very fact specific. Because the Court does not find that the Bank was a responsible person, there is no need to consider the evidence in support of the first factor.

to-day decisionmaking of the enterprise with the respect to

(A) Environmental compliance or

(B) All, or substantially all, of the operational (as opposed to financial or administrative) aspects of the enterprise other than environmental compliance. Operational aspects of the enterprise include functions such as that of facility or plant manager, operations manager, chief operating officer, or chief executive officer.

Financial or administrative aspects include functions such as that of credit manager, accounts payable/receivable manager, personnel manager, controller, chief financial officer, or similar functions.

40 C.F.R. 300.1100(c)(1).

The EPA rule provides that a finding of actual participation in management must be made in order to impose liability on a lender. If the borrower was in possession of the vessel or facility during the period in question, as is the case here, the EPA rule further provides that a lender is in actual control only if it takes any of three actions. First, the lender will be deemed to be participating in management if it exercises decisionmaking control over the borrower's environmental compliance. 40 C.F.R. 300.-1101(c)(1)(i). No such allegation has been made in this case, and this section does not apply. Second, the lender will be deemed to be participating in management if it assumes or manifests responsibility for the overall management of the enterprise encompassing day-to-day decisionmaking of the enterprise with respect to environmental compliance. 40 C.F.R. 300.-1101(c)(1)(ii)(A). Again, no party has claimed that the Bank exercised day-to-day decisionmaking with respect to environmental compliance. Third, the lender will be deemed to be participating in management if it assumes or manifests responsibility for the overall management of the enterprise encompassing day-to-day decisionmaking with respect to all, or substantially all, of the operational aspects of the enterprise other than environmental compliance,

as opposed to financial or administrative aspects of the business. 40 C.F.R. 300.-1101(C)(1)(ii)(B). This third test must be applied to the facts of this case.

■ The first period of time at issue includes Mewhort's and Bunker's participation on AUSCO's board. Although Mewhort and Bunker served as directors, their status as directors does not alone impose liability. More is required. See *Kelley ex rel. Natural Res. Comm'n v. Arco Industries Corp.*, 723 F.Supp. 1214, 1220 (W.D.Mich.1989). Mewhort's and Bunker's only involvement with AUSCO occurred during participation in full board of director meetings which only occurred once or twice a year. The full board's function was to deal with pension and capital spending issues. The executive committee dealt with operational issues and environmental compliance. Neither Mewhort nor Bunker sat on the executive board. The Court finds that there are no attenuating facts to support liability on the basis of this limited participation.

Further, the cases cited in plaintiffs' brief as supporting Bank liability, were decided prior to the enactment of the EPA rule and are factually inapposite. For example, the Bank involvement here is not as overreaching as that upon which the court relied to impose liability in *Rockwell Int'l Corp. v. IU Int'l Corp.*, 702 F.Supp. 1384, 1390–91 (N.D.Ill.1988). In *Rockwell*, the defendant IU was found to participate in management because it hired or approved the hiring of certain corporate officers, some of whom were IU officers who remained in charge throughout various changes in ownership, determined the responsibilities of those officers it appointed, established the procedure for and approved the operational plans, suggested changes in procedures that directly affected the disposal of hazardous substances, and stated in public announcements that it operated the facility. Although it is likely the court would reach the same result today, the recent EPA rule does temper the value of

the decision and the others entered prior to its enactment.[9]

The additional evidence presented by the State does not show that the Bank was intimately involved with the day-to-day decisionmaking regarding operational aspects during this first time period. This evidence consists of a series of memoranda prepared by Hugh Porter, the Bank's front line officer for AUSCO. The Bank memoranda in the 1979–1985 era describe the operations of AUSCO, but always in reference to the financial affairs of the business. Additional memos discuss strategies to force the Harris Bank to share the financing risks more equally or force the Harris Bank to withdraw. Similarly, the documents discussing labor disputes do so in the context of their financial impact and benefit to the company. The Bank's involvement, as reflected in these memoranda, falls within the scope of activities permitted by the EPA rule.

■ Moreover, the Bank's close monitoring of AUSCO does not remove MNB from the lender liability exemption. Nor does Bank encouragement of AUSCO to follow the consolidation plan make the exemption unavailable to MNB. As the EPA rule makes explicit, influence alone does not incur liability; actual control is necessary. Nor do conditions imposed by the Bank for continued financing exclude the Bank from the exemption. The financial health of the company was such that the Bank needed to protect its security interest. There is no evidence of actual decisionmaking by the Bank as is needed to find liability. Accordingly, the Court GRANTS the Bank's motion for summary judgment for the period from 1964 to August, 1986.

■ The Court now turns to the second time frame at issue, the Sachs era. The Sachs era begins with the August 6, 1986 meeting, at which the Bank advised AUSCO it would not continue financing unless the Tiscornias provided personal guarantees,[10] trimmed expenses such as Lester Tiscornia's salary and retained a turnaround specialist. The Bank's insistence upon outside management under threat of calling the loan does not constitute impermissible control. See, e.g., *In re Badger Freightways, Inc.*, 106 B.R. 971, 975–77 (Bankr.N.D.Ill.1989).[11]

Moreover, the company agreed to hire a specialist, and the company negotiated the agreement with Sachs. The company was free to disregard the Bank's advice and gamble that the Bank would not call the loan. These actions indicate the Bank merely influenced, but did not control, the decisionmaking at AUSCO.

Certainly, the terms of the loan agreement gave the Bank the ability to exercise strong influence over AUSCO, as is true with respect to virtually all well drafted commercial loan agreements. At any time, however, AUSCO had the right to disregard the advice of the Bank, and in fact did so when the company fired Sachs 21 months after he was hired.

The Court is also unpersuaded by the State's argument that Sachs' bonus arrangement is concrete evidence that the Bank acted as an owner or operator under CERCLA. The letter of credit that was offered during negotiation of Sachs' contract could be drawn on for payment of the bonus to Sachs as AUSCO's indebtedness to the Bank was reduced. Clearly such an

---

**9.** Other cases decided before the EPA rule recognized that monitoring the financial affairs of the debtor does not constitute participation in management. See, e.g., *United States v. New Castle County*, 727 F.Supp. 854, 866 (D.Del.1989); *United States v. Nicolet Inc.*, 712 F.Supp. 1193–1204–05 (E.D.Penn.1989).

**10.** There is some dispute as to whether the Bank demanded personal guarantees from the Tiscornias. However, it is undisputed that the Tiscornias did not provide the Bank with personal guarantees. The resolution of this dispute is not material to deciding this motion.

**11.** Although the Court is not bound by decisions of the bankruptcy court, it does find that the doctrine of equitable subordination which allows a lender's claims to be subordinated if the bankruptcy court finds that the lender impermissibly controlled the debtor, is somewhat analogous to the EPA rule. Both the EPA rule and the doctrine of equitable subordination outline the parameters of participation in which a lender must remain to protect its security interest and retain its status as a lender.

arrangement provided an incentive for Sachs to pay down the company's debt to the Bank, but this arrangement did not empower the Bank with control over the day-to-day decisions of company operations. The EPA rule provides that a person who exerts influence over a "facility manager but who has no power to direct or implement operational decisions is not 'participating in management,' even if the level of influence exerted over the borrower is substantial." 57 Fed.Reg. 18359. Here, the Bank's influence over Sachs, however substantial, remained influence, and did not constitute control.

■ Additional evidence relied upon by the State as an indicia of control is that the Bank and Sachs met more than once a week to discuss the corporation. The Court does not find that regular communication between Sachs and the Bank constitutes evidence or even an inference of actual decisionmaking. Daily monitoring of the debtor's financial situation or suggestions as to what action the debtor should follow to resolve its financial difficulties does not justify an exemption from the lender liability exclusion contained in the EPA rule.[12] Here, AUSCO agreed when it secured the loan that the Bank would monitor the company's cash flow on a daily basis. Such monitoring reflects valid financial concerns, not operational concerns, and the Bank's actions did not exceed the scope of monitoring authorized in the loan agreement.

Although the Bank and Sachs deny that the Bank was involved in making decisions, the Court notes that there are executive committee meeting minutes that report that Sachs had cleared an expenditure of $120,000 to relocate the general offices of AUSCO with the Bank. Furthermore, Sachs stated at a special meeting of the board of directors that he had discussed at great length with the Bank the recording of an inventory write-down at AUSCO for the purpose of establishing an artificial income stream.

Again, these topics relate to financial transactions and business. There is no evidence that the Bank decided where the offices should be relocated, when the move should take place, and who should move. Consultation with the Bank about an expenditure does not constitute control. Similarly, questions as to whether to create an artificial income stream fall within the area of financial functions of a company, and come within the lender liability exclusion.

The State supports its argument that the Bank participated in the management of the company with evidence that David Day, an employee of the Bank, indicated to both James Tiscornia and Loren Gerber that he had instructed Sachs that Sachs could fire them. This statement by a Bank employee was accurate; as CEO, Sachs had the authority to fire company employees. Day also stated that Lester Tiscornia, owner of the company, could fire Sachs. This statement was also accurate. Neither statement creates an inference of Bank control. They merely reflect Day's understanding of the corporate structure of AUSCO.

Gerber further stated that Day used the term "we" when he made the first statement, thereby creating an inference that the Bank and Sachs could make personnel changes. To vest the Bank with management authority because a Bank employee may have used language inclusive of the Bank, the Court would have to adopt the "Al Haig" theory of power.[13] Just because David Day said he was in charge did not make it so. There is no evidence that the Bank ever fired anyone, including those threatened by Day's announcement. Moreover, the language of the lender liability exemption labels administrative functions as those performed by a personnel manager. 40 C.F.R. 300.1100(c)(1)(ii)(B). Accordingly, even if the Bank had the authority to

12. The Court notes that a similar result is reached by bankruptcy courts with respect to the doctrine of equitable subordination. *See In re Teltronics Services, Inc.*, 29 B.R. 139, 172 (Bankr.E.D.N.Y.1983) (citations omitted).

13. Although Al Haig thought he was in charge after the shooting of President Reagan, this belief did not make him in charge. Here, the issue is actual control over decisionmaking.

fire management, it could still potentially be entitled to the exclusion.

In *U.S. v. R.W. Meyer, Inc.*, 889 F.2d 1497, 1500 (6th Cir.1989), *cert. denied*, 494 U.S. 1057, 110 S.Ct. 1527, 108 L.Ed.2d 767 (1990), the court concluded that in December of 1980, Congress enacted CERCLA "to initiate and establish a comprehensive response and financing mechanism to abate and control the vast problems associated with abandoned and inactive hazardous waste disposal sites." It appears ironic to this Court that the standard of liability the State seeks to impose upon the lender in this case may well result in increasing the number of abandoned and inactive hazardous waste disposal sites. If banks are held liable under CERCLA for actions such as occurred in this case (i.e., suggesting or demanding new management, monitoring the borrower's financial health, and consulting regularly with its customer), it is reasonable to assume that banks will quickly react to such judicial reasoning by refusing to extend additional credit or otherwise continue to work with troubled borrowers. Banks will insulate themselves from liability by calling loans rather than nursing troubled borrowers back to financial health. This anticipated response virtually guarantees an increase in the country's inventory of abandoned and inactive hazardous waste disposal sites. Although imposing liability on the Bank in this case might not yield such a result in and of itself, this Court declines to extend the definition of responsible parties to include the Bank.[14]

The Court has carefully reviewed all of the indicia of Bank participation in the management of AUSCO's business relied upon by the State in support of its motion. The Court finds that individually and collectively, the indicia relate to financial or administrative aspects of the business, as opposed to the operational aspects necessary for a finding of liability under EPA lender liability rules.

There being no evidence before the Court that the Bank crossed the murky line from the ability to influence operational decisions to actually making operational decisions at AUSCO, the State's motion for summary judgment must be DENIED. The Court GRANTS the defendant Bank's motion for summary judgment.

IT IS SO ORDERED.

**14.** It further appears to the Court that the Bank's actions in this case may well fall within the "work-out" exemption to lender liability set forth in EPA Rule 40 C.F.R. 1100(c)(2)(ii)(B). The Bank has not relied on this exemption, however, and the parties have not provided sufficient facts upon which to determine the applicability. Accordingly, the Court does not reach this question.