In re HEARTLAND CHEMICALS, INC., an Illinois Corporation, Debtor.

UNSECURED CREDITORS' COMMITTEE, for itself and on Behalf of the Estate of Heartland Chemicals, Inc., Plaintiff,

v.

BANQUE PARIBAS, a French Banking Corporation, Defendant.

Bankruptcy No. 86–70753.
Adv. No. 87–7201.

United States Bankruptcy Court,
C.D. Illinois.

Jan. 28, 1992.

**506**

Timothy A. French, David F. Heroy, Ralph T. Russell, Jr., Neal Gerber & Eisenberg, Chicago, Ill., for Unsecured Creditors' Committee.

Emmet A. Fairfield, Local Counsel, Brown Hay & Stevens, Springfield, Ill., for Unsecured Creditors' Committee.

Clyde Meachum, Meachum & Meachum, Danville, Ill., for Heartland Chemicals, Inc.

Stephen C. Carlson, Janet E. Henderson, John A. Heller, Jeffrey C. Steen, Sidley & Austin, Chicago, Ill., James M. Mulvaney, Local Counsel, Gunn & Hickman, Danville, Ill., for Banque Paribas.

## OPINION

LARRY L. LESSEN, Chief Judge.

This adversary proceeding involves the manner in which the Defendant, Banque Paribas, terminated its financing of the Debtor, Heartland Chemicals, Inc., a local distributor of agricultural chemicals. The Plaintiff in this action is the Unsecured Creditors' Committee of Heartland. The Committee is proceeding on its own behalf and on behalf of the estate of Heartland.

Heartland was a wholesale distributor of agri-chemicals to agricultural supply retailers in Illinois and Northwest Indiana. Banque Paribas was its secured, asset based lender. In 1985, the Bank decided to exit from the agricultural lending market in the United States. In the fall of 1985, the Bank informed Heartland of this decision and its intent not to renew Heartland's loan when it expired on November 30, 1985. In fact, the Bank and Heartland continued negotiations regarding short-term financing of Heartland through April 1986 when Heartland's trade suppliers filed an involuntary bankruptcy petition against it.

The Bank was a secured creditor, and at the time of the filing of the involuntary petition was owed approximately $4.9 million. Heartland's unsecured creditors were owed in excess of $7.4 million as of the petition date. To date, the Chapter 7 Trustee has sold all of Heartland's inventory, collected its accounts receivables, and disposed of all or most of Heartland's other assets. The Bank has been paid in full on its claim on an interim basis as a secured creditor. The unsecured creditors have received a 21% dividend on their claims. The Trustee has additional funds on hand to cover potential attorneys' fees in this proceeding.

The Committee argues that the Bank made a conscious decision to withdraw from the Heartland financing at a future time advantageous to the Bank and disadvantageous to the chemical companies which were supplying Heartland with its inventory. To effectuate this plan, the Committee contends that the Bank led Heartland's representatives to believe that the Bank would continue to finance Heartland's operations through the 1986 season. In addition, the Committee contends that the Bank misled Heartland's trade suppliers into believing that there was no problem with the Heartland account so they would ship additional inventories of agricultural chemicals on unsecured credit to Heartland. This additional inventory then became the Bank's collateral and ultimately insured that the Bank was able to recover its loan balances fully from the liquidation of Heartland's assets. The Committee asserts that the Bank's actions warrant the equitable subordination of its secured claims to their unsecured claims under 11 U.S.C. § 510(c), the assessment of liability for preferences under 11 U.S.C. § 547(b) and common law fraud, and, ultimately, the disallowance of its claims. The Bank maintains that it acted properly and in accordance with the provisions of its loan agreement. The Bank asserts that it did not exercise control over Heartland. Additionally, the Bank denies making any false

statements to Heartland or to any of Heartland's trade creditors. Alternatively, the Bank suggests that Heartland's trade creditors did not reasonably and justifiably rely on any information received from the Bank. The Bank further suggests that the trade creditors suffered little or no damage from any actions taken by the Bank.

The record in this case is voluminous. During a two week trial, the parties offered testimony from many witnesses and introduced thousands of pages of documents into evidence. In addition, the parties designated dozens of depositions for the Court to read. The parties have thoroughly briefed their respective positions. Proposed findings of fact and conclusions of law have been filed by the parties, and the Court has found them to be helpful.

The sheer volume of the record in this case precludes the Court from discussing every piece of evidence introduced at trial. The following findings of fact will focus on the facts which the Court found most relevant to its decision making. The Court's failure to refer to certain items of evidence does not imply that they are not supported by the record, but rather to the relative importance of these facts to the decision making process. *See, In re Helm*, 49 B.R. 573, 574 (Bankr.W.D.Ky.1985).

## FINDINGS OF FACT

1. The Debtor, Heartland Chemicals, Inc., was incorporated in 1975. Heartland was engaged in the business of distributing agricultural chemicals to dealers throughout Illinois and Northwestern Indiana.

2. Heartland purchased its chemical supplies from agri-chemical manufacturers, including those companies comprising the Committee. The members of the Committee comprise ten of the largest manufacturers and suppliers of agricultural chemicals in the United States: Monsanto Agriculture Products Co., Mobay Chemical Corporation, Shell Chemical Company, Elanco Products Company, E.I. DuPont Company, Inc., Ciba-Geigy Corporation, ICI Americas (formerly Stauffer Chemical Company), Dow Chemical Company, BASF Corporation, and Union Carbide Corporation (since

resigned with its claim assigned to Rhone-Poulenc Ag Corporation).

3. Heartland was an 80%-owned subsidiary of Ceres Management Corporation. The remaining 20% of Heartland's outstanding shares were owned by W. Frank Gibbens, the former general manager of Heartland. E. Lindell Huisinga was the President and George Timmons was the Secretary of Heartland.

4. Ceres was formed on April 1, 1975, by Mr. Timmons and Mr. Huisinga as an agribusiness holding company. Mr. Timmons owned 52% of the outstanding common shares of Ceres, and Mr. Huisinga owned 48% of the Ceres outstanding shares. Mr. Timmons still owns his 52% interest in Ceres; Mr. Huisinga's interest in Ceres is now held by a nominee of Citibank, N.A.

5. In addition to Heartland, Ceres owned a controlling interest, either directly or indirectly, in the following agribusiness entities: Galesville Chemical Co., Inc., an Illinois distributor of liquid fertilizer to local farmers in Illinois; Community Grain Company, a Delaware corporation operating a 2.4 million bushel grain elevator in Illinois; Michigan Grain Terminal, Inc., an Illinois corporation owning (1) 80% of the stock of Mississippi Rice and Grain Company, a 1.5 million bushel rice-curing facility in Mississippi, and (2) a 97% general partnership interest in Grand River Grain Company, an Illinois corporation that formerly stored, dried, and warehoused grain in Michigan; and Agri-Planning and Production, Inc., an Illinois corporation engaged in consulting and specializing in the evaluation of land productivity and the operation and management of farms in Illinois. These entities, including Heartland, are sometimes referred to as the "Ceres Group".

6. Heartland's business was seasonal. Heartland purchased most of its inventory between January and March of each year. At the beginning of the spring planting season in April, Heartland would start to sell its inventory and generate accounts receivable. Heartland would generally collect its accounts receivable beginning in

June or July. As a result of the seasonality of its business, Heartland's inventory would be at its lowest level during the months of September through November, and at its highest level during the months of January through early April.

7. Heartland often purchased its inventory pursuant to inventory protection programs offered by its trade suppliers. These programs were designed to protect distributors like Heartland from losses arising from the failure to sell inventory during the regular spring selling season. Pursuant to these programs, Heartland would maintain possession of its unsold inventory, but the trade suppliers would make cash refunds or rebates to Heartland in the late summer or early fall in amounts corresponding to a specified percentage of the value of the unsold inventory. The trade suppliers would then rebill Heartland so that repayment of the rebated inventory would be due the following spring.

8. Certain trade suppliers offered generous discounts to Heartland for early payment on their accounts. It was generally in Heartland's best interest to take advantage of these discounts. Therefore, Heartland would borrow the money to pay these accounts from its asset-based lender.

9. Banque Paribas became involved with Heartland in the spring of 1984. Larry Lewton, who joined the Bank in 1984 was hired for the specific purpose of establishing a portfolio of agribusiness loans. He had become familiar with the Heartland account during his previous employment at the Harris Bank. In fact, Harris had turned down Lewton's proposal for a loan to Heartland because Harris felt that Heartland was too highly-leveraged. When he arrived at Banque Paribas, Lewton made a similar proposal for a loan to Heartland. The Bank was receptive to this proposal and issued a commitment letter to Mr. Timmons and Mr. Huisinga on April 2, 1984, offering to loan money to Heartland and/or Grand River Grain Company.

10. At the end of April 1984, the Bank became a participant in an ongoing banking relationship between Citibank, N.A., Heartland, and several of Heartland's corporate affiliates. Citibank first became involved with Heartland and its affiliates in 1981 as their asset based lender. By 1984, there were four affiliated entities that were designated as "Borrowers" under the Citibank loan documents: Heartland, Grand River, Community Grain and Galesville. However, only Heartland was actually borrowing funds under the Citibank loan after 1983. All advances by Citibank were thereafter drawn by Heartland under its promissory note and recorded against its note. The only exception to this practice occurred between April 26 and August 1, 1984, when Grand River also borrowed under a separate note.

11. On April 26, 1984, the Bank entered into a Participation Agreement with Citibank whereby the Bank agreed to fund up to 27.27% (or $7.5 million) of Citibank's lending commitments to the Borrowers. Centerre Bank of St. Louis, Missouri, was also a participant in the Citibank loans at this time.

12. In connection with the Participation Agreement, Mr. Huisinga executed promissory notes on behalf of Heartland, Grand River, Community Grain, and Galesville Chemical. These notes reflect that as of April 26, 1984, the outstanding unpaid principal balance of $15,900,000.00 on the Citibank line of credit was all owed directly by Heartland.

13. Soon after April 26, 1984, the Bank began providing funds as a participant in the Citibank line of credit. Citibank disbursed loan proceeds either to a Heartland account in Heartland's name or to a Grand River account in Grand River's name. After disbursing the loan proceeds, Citibank would then charge the Bank for its percentage in each disbursement.

14. Mr. Timmons and Mr. Huisinga agreed in accepting the Bank's commitment letter of April 2, 1984, to maintain "separate documentation and checking accounts" for Heartland and Grand River Grain. Moreover, Citibank and the Bank agreed before the Bank became a participant that the Bank would only participate in advances to Heartland or Grand River Grain. Citibank's books and records indi-

cate that the Bank only participated in advances to Heartland and Grand River.

15. In August 1984, Grand River entered into a partnership with the Andersons and ceased participation in the Citibank line of credit. All Citibank advances after this time were made solely to a Heartland account in Heartland's name.

16. The Heartland and Grand River accounts were "zero balance accounts" or "conduit accounts". Funds advanced to these accounts were automatically transferred into the Ceres "concentration account".

17. The "concentration account" was a centralized cash management system employed by Ceres to fund Ceres and its affiliates. The concentration account operated as follows: If the operating account of Heartland or another Ceres affiliate had a cash balance at the end of a day, that balance was automatically swept into the concentration account so that the operating account would have a zero balance at the end of the day. On the other hand, if the operating account had a negative cash balance at day's end, then an amount sufficient to bring the balance of that account to zero would be transferred automatically from the concentration account before the close of each business day.

18. In October 1984, the Bank purchased an assignment of Citibank's interest in the loan for $3,573,803.62. The Purchase and Assignment Agreement dated October 30, 1984, referred to Heartland, Galesville Community Grain, and Grand River as "Borrowers," and each of these entities executed a promissory note in favor of the Bank in the amount of $12,500,-000.00, the adjusted line of credit. As of October 30, 1984, the outstanding loan balance in Heartland's name was $3,510,-000.00; Grand River, Community Grain, and Galesville had no outstanding loan balances.

19. Beginning in October 1984, the Bank had discussions with Mr. Timmons and Mr. Huisinga regarding the possibility of setting up small, separate lines of credit for some of Heartland's affiliates. However, at a February 12, 1985, meeting the Bank declined to make a loan commitment to Ceres. On April 17, 1985, Mr. Lewton sent Mr. Timmons and Mr. Huisinga commitment letters only for Heartland and Mississippi Rice and Grain.

20. The Bank's loan was solely to Heartland, not to the Ceres Group. Although the Ceres affiliates may have had use of the Heartland funds through the magic of the concentration account, it was never the intent of the Bank to loan money to the other entities. The loan documentation and internal Bank records all show the Bank's intent to limit its loan to Heartland to the exclusion of the Ceres Group. If certain proceeds from the Bank line of credit to Heartland were used by Ceres or Ceres affiliates, it was because Heartland loaned these sums to Ceres and the affiliates, not because the bank loaned the money to entities other than Heartland.

21. The Purchase and Assignment Agreement of October 1984 contemplated a redocumentation of the line of credit. There were multiple conversations concerning redocumentation after October 1984. Negotiations continued until the actual signing of the Loan and Security Agreement on May 15, 1985. This document was the product of extensive arms-length negotiations between sophisticated, knowledgeable business entities, which were represented by able counsel and which voluntarily agreed to be bound by the terms of the Agreement.

22. Borrowing base certificates were provided to the Bank twice a month. These certificates listed the eligible collateral of the borrower, and calculated the total collateral base against which loan advances could be made by multiplying the eligible collateral by the approved advance rate. For example, an approved advance rate of 80% meant that if 80% of the total collateral base exceeded the amount of the outstanding bank loan (so that there was an excess in the borrowing base), then an additional loan advance (up to the maximum amount of the available line of credit) could be made.

23. The closing of the line of credit for Heartland and Mississippi Rice took place

on May 15, 1985, at the Ceres office. (The Bank did not bring to the closing a loan and security agreement for Galesville.) The Loan and Security Agreement executed by the representatives of Heartland named Heartland as the only borrower of all outstanding amounts owed to the Bank, provided for an 80% advance rate on Heartland's inventory, and established a line of credit for Heartland that was not to exceed $9.5 million. The stated purpose of the loan was to finance Heartland's seasonal working capital needs, and the agreement specifically provided that Heartland was not permitted to make or permit to exist loans to any other entity. To secure its obligation under the Loan and Security Agreement, Heartland gave the Bank a security interest in substantially all of its assets. The expiration date of the Loan and Security Agreement was set at November 30, 1985. Mr. Timmons and Mr. Huisinga each executed guaranties in favor of the Bank wherein they guaranteed Heartland's obligation under the Loan and Security Agreement.

24. Notwithstanding the terms of the May 15, 1985, Loan and Security Agreement intercompany transfers of funds continued through the concentration account.

25. On May 9, 1985, following an audit of Community Grain's facilities, Ceres representatives discovered that the general manager of Community Grain, Jim Traub, had altered the company's accounts, and that there was a significant shortage of grain inventory on hand. Upon the discovery of these facts, Mr. Traub was asked to resign.

26. In the May 15, 1985, Loan and Security Agreement, Heartland represented that it was solvent and had the ability to pay its debts as they matured. The evidence at trial supported Heartland's claim of solvency in May 1985. Moreover, Heartland continued to remain solvent as a going concern through the end of 1985.

27. Nevertheless, Heartland's borrowing base certificates began to reflect negative margins at the end of July 1985. Accordingly, the Bank became concerned about the Heartland debt. The Bank started to require daily reporting of the deposits received by Ceres, the checks written each day by Ceres, and the checks outstanding against the Ceres accounts. In addition, the Bank demanded daily borrowing base certificates from Heartland.

28. The Bank, through Mr. Lewton, made a number of suggestions to Heartland as to the running of its business and the payment of its bills. Some of these suggestions were followed. For example, Heartland set up a separate account to assist in paying its payables. Future advances from the Bank were made to this account and it was no longer operated as a zero-balance account. Mr. Lewton also made a number of suggestions concerning Community Grain which helped Community Grain with the State of Illinois and facilitated the renewal of its state license. Other suggestions of the Bank, however, were not followed. Contrary to the Bank's suggestions, Heartland did not reduce the Ceres debt to zero, sell Ceres farmland, sell some of the smaller Ceres companies to bring in cash, or process its receivables through a lock box. In addition, Mr. Huisinga ignored Mr. Lewton's suggestion that he move his office to Community Grain to oversee the day-to-day activities of Community Grain. Mr. Lewton's recommendations to close the Community Grain Weedman facility and to reduce the number of Community Grain employees to three until the harvest were also disregarded.

29. The Bank did not exercise control over Heartland and its business. The Bank did not own or hold a pledge of any Heartland stock. The Bank did not place any of its current or former employees on Heartland's board of directors. Heartland was managed by Mr. Gibbens, and there is no evidence that the Bank usurped Mr. Gibbens' control of the business. Mr. Gibbens controlled Heartland's inventory purchases. The Bank never directed Heartland not to pay its trade suppliers. The Bank continued to advance Heartland money through the end of 1985 to pay its suppliers and, in fact, did not turn down a loan request from Heartland during this period. Heartland

continued to pay its trade suppliers through the early part of 1986.

30. The Bank did not exercise undue dominance over Heartland. Mr. Timmons, Mr. Huisinga, and Mr. Gibbens were sophisticated, experienced businessmen. They had the continuing benefit of professional legal, financial and business advice. Although the Bank made myriad recommendations to Heartland, these recommendations were never blindly obeyed. The evidence established that Heartland ignored more of the recommendations than it followed.

31. The May 15, 1985, Loan and Security Agreement required a personal guaranty from Heartland's 20% owner, vice-president and operations manager, Frank Gibbens, just as it required personal guaranties from Heartland's other principals, Mr. Timmons and Mr. Huisinga. (It was not unusual for the Bank to require a personal guaranty; Citibank, Springfield Marine Bank, and various trade creditors also required a personal guaranty from Mr. Gibbens.) However, Mr. Gibbens balked at providing his personal guaranty. In June, the Bank agreed to a limited 20% guaranty from Mr. Gibbens because he was only a 20% owner of Heartland. Nevertheless, the personal guaranty was not forthcoming from Mr. Gibbens. Finally, Mr. Gibbens signed the personal guaranty during a meeting with Mr. Lewton in September 1985. Mr. Gibbens testified that he only signed it after Mr. Lewton threatened to put Heartland out of business; Mr. Lewton testified that Mr. Gibbens signed it after Mr. Lewton explained that the failure to sign the personal guaranty would be reported to the Paris office and that Paris might decide that they would not continue to finance Heartland without the personal guaranty. In either event, it is clear that the Bank was entitled to the personal guaranty under the Loan and Security Agreement and that it was normal for an asset-based lender like the Bank to require a personal guaranty from a manager-stockholder like Mr. Gibbens.

32. During the summer of 1985, the Bank initiated a review of the profitability and viability of its agribusiness lending operation in the United States. In late September or early October of 1985, the head of the Bank's international department in Paris, Michel Barret, decided that the Bank would not invest further in agricultural lending in the United States. This decision applied to new agribusiness clients; the Bank did not intend to immediately cut off all of its existing accounts. Mr. Barret's decision was not related to the Bank's administration of the Heartland account. Indeed, Mr. Barret's testimony indicated that the Heartland account was too small to be of much concern to him.

33. After deciding to exit the agribusiness lending field, the Bank decided to find another lending institution to take over the Bank's agribusiness portfolio. In the meantime, the Bank intended to keep any existing agribusiness accounts that could not be placed with another lender. No deadline was set for this decision or for Mr. Lewton and his staff to leave the Bank.

34. In late 1985 and early 1986, the Bank extended or renewed several lines of credit to existing agribusiness borrowers, including Flo-Lizer, Inc., Van Diest Supply Company, Waterfield Grain Company, and Siemer Milling Company. In particular, on February 19, 1986, the Bank agreed to extend through June 30, 1986, a line of credit for Flo-Lizer which, like Heartland's line of credit, had expired by its own terms on November 30, 1985. (Flo-Lizer, like Heartland, also ended up in bankruptcy.) In late 1985, the Bank issued a $400,000 to $500,000 line of credit to Waterfield Grain Company. The Bank extended the line of credit of Van Diest Supply Company through January 31, 1986. Finally, on August 23, 1985, the Bank approved an extension of credit to Siemer Milling Company through August 31, 1986.

35. On November 5, 1985, Mr. Lewton informed Heartland that the Bank was not going to renew very many agribusiness loans. Mr. Lewton stated that the Bank was considering a transfer of certain of its agribusiness loans to another bank, and that he might go to the new bank to continue servicing those accounts. In the mean-

time, Mr. Lewton indicated that the Bank could well continue to finance Heartland past the November 30, 1985, expiration date of the Loan and Security Agreement.

36. At this same November 5, 1985, meeting, Mr. Lewton delivered to Heartland a letter dated November 4, 1985, which demanded repayment of the $5.3 million owed to the Bank by November 30, 1985. This letter basically told Heartland what it already knew: the Loan and Security Agreement expired on November 30, 1985. Although the letter demanded repayment of the outstanding loan proceeds, this letter was not characterized as a "demand letter". A typical demand letter declares a default, accelerates the principal and interest, and sets a fixed date for full repayment. The November 4, 1985, letter did not do any of these things. Rather, this was the type of letter that is customarily sent out to a borrower upon expiration of a line of credit even where possible renewal is under discussion.

37. The Bank continued to negotiate a renewal of the Heartland line of credit in good faith even after the Bank decided to withdraw from the agribusiness field. However, the Bank was only interested in continuing to finance Heartland if certain terms and conditions were met. These terms and conditions were set forth in letters to Heartland dated August 8, 1985, August 20, 1985, January 22, 1986, and February 13, 1986. These terms and conditions included the termination of intercompany advances, the sale of Ceres farmland, and a scaledown of Community Grain, Ceres, and Galesville. Heartland never agreed to the terms and conditions of the Bank's proposal letters.

38. The Bank's letter to Heartland of November 4, 1985, indicated the Bank's willingness to cooperate fully with Heartland's transition to another bank or asset-based lender. Heartland, however, showed no progress in obtaining alternate financing.

39. In late November of 1985, Terra Chemicals, Inc., an agribusiness concern based in Iowa, made a nonbinding offer to purchase the assets of Heartland. Mr. Timmons and Mr. Huisinga determined that this offer was too low. Further discussions with Terra broke down when Terra was unwilling to offer enough money to satisfy Mr. Timmons and Mr. Huisinga.

40. Mr. Lewton left the Bank at the end of January 1986. The Heartland account was taken over by Patrick Miller and Timothy Donnon. Mr. Miller and Mr. Donnon continued to negotiate with Heartland through March of 1986.

41. On April 25, 1986, Union Carbide, Mobay, Dow and Shell—all trade suppliers of Heartland and members of the Unsecured Creditors' Committee—filed an involuntary petition for relief against Heartland.

42. Heartland's trade suppliers were some of the largest and most sophisticated chemical manufacturing conglomerates in the world. They all had credit departments staffed by professional credit analysts and others with extensive experience and training in credit. The credit representatives testified at trial to extensive education, training, experience, and responsibility in credit matters. Many had unlimited credit authority.

43. Heartland's trade suppliers had regularly dealt with Heartland since the 1970's. Some trade creditors obtained security agreements or guaranties regarding Heartland. The trade creditors recognized that Heartland was a highly leveraged operation, but took the business risk of shipping product to Heartland because they were in the business of selling agricultural chemicals. Heartland regularly met its payment obligations to the trade creditors.

44. In making their credit decisions, the trade creditors looked at a wide range of credit information: (1) the suppliers' history with the Heartland account; (2) the experience of other suppliers with the Heartland account; (3) information obtained from direct telephone contacts with other credit departments that dealt with Heartland; (4) information about Heartland obtained from other credit managers during discussions at quarterly meetings sponsored by the agricultural division of the National Chemical Credit Association, the

trade association comprised of the manufactures of agricultural chemicals; (5) information obtained from Heartland's bank about the status of Heartland's line of credit for the next season; (6) the financial results obtained from Heartland's operations; and (7) information obtained from Heartland's representatives about the company's operation.

45. The trade suppliers received financial statements from Heartland on an annual basis. The financial statements, which the trade suppliers viewed as one of the most important sources of credit information, were normally available within 60 to 120 days of the July 31 end of the fiscal year. In 1985, however, the financial statements were not forthcoming. In fact, the 1985 financial statements were never issued. Heartland's accountant explained that there were two reasons why audited financial statements for Heartland were not issued for the fiscal year ending July 31, 1985. First, the accountant believed that the indebtedness owed to the Bank should be reflected as a current obligation of Heartland rather than as an obligation of Ceres because the Loan and Security Agreement was between Heartland and the Bank. Second, the accountant believed that the financial condition of Heartland did not warrant a clean or unqualified opinion. Instead, the accountant thought that Heartland should receive a going concern qualification with a related footnote disclosure which would explain Heartland's financing problem.

46. The network of trade credit information through which trade creditors shared information about mutual accounts was largely a myth, or, at best, ineffective. The Heartland account was not discussed at any National Chemical Credit Association meetings in 1985. Moreover, the trade creditors failed to share relevant information about the Heartland account. For example, Heartland told the Monsanto credit representative on December 10, 1985, that Ceres and several of Heartland's other affiliates had experienced severe losses during 1985 and that the Bank was trying to get out of agricultural lending. Nevertheless, the Monsanto credit representative failed to relay this very significant information about the Heartland account to the other trade suppliers even when one of them specifically called him to ask about the Heartland account. Other trade creditors failed to share information they obtained regarding Ceres' expected 1985 losses, Heartland's change in its primary lender, or the possible sale of Heartland.

47. Trade creditors who made direct inquiries to the Bank about the status of Heartland's bank financing were not misled by the Bank. According to industry standards, information supplied by a bank must be based on historical fact rather than on future projections. In general, the trade creditors were told that the Heartland account was being handled in a "satisfactory" manner. In the credit industry, the term "satisfactory" is generally understood to mean that the bank is generally satisfied with the performance of the borrower. Where the borrower is current on its principal and interest payments, the lender has not declared a default under the loan agreement, and the borrower has sufficient borrowing availability under a borrowing base formula, a loan relationship can be accurately described as satisfactory. These factors were present in the instant case. Moreover, the Bank was still loaning money to Heartland as late as December 26, 1985, and the Bank was also negotiating with Heartland for a renewal of the Heartland line of credit. Under these circumstances, the Bank did not mislead creditors by describing the Heartland account as satisfactory.

48. The Bank did not tell any trade creditors that Heartland's line of credit was in place for 1986. Some trade creditors did not specifically ask this question, and the Bank followed the industry custom of not volunteering more information than was requested. The Bank told other trade creditors, including Union Carbide, that the line of credit had expired, and that the renewal as under negotiation. Mr. Lewton specifically told the Union Carbide credit representative that the line of credit would not be renewed before the receipt of the 1985 financial statements. As it turned

out, these statements were never completed.

49. Heartland was aware in November 1985 that its financing might terminate on November 30, 1985. Nevertheless, Heartland asked the various trade suppliers to keep shipping product to Heartland. Heartland did not advise the trade suppliers to file financing statements in order to protect themselves.

50. On December 10, 1985, Heartland advised Monsanto that there was a problem with the Heartland financial statements and that Ceres had lost money due to losses at two grain companies. Based on this negative credit information, Monsanto did not ship any more product or extend any more credit to Heartland. Significantly, Monsanto did not fill a $2,500,000.00 order placed by Heartland on December 23, 1985.

51. Only four trade creditors—Elanco, Union Carbide, Mobay 'and Shell—shipped product to Heartland after the expiration of the Loan and Security Agreement on November 30, 1985. None of these shipments were based on misrepresentations of the Bank. Shell shipped $853,930.86 of product to Heartland on January 6, 1986, without the approval of its credit department. In fact, Shell did not conduct a credit review of Heartland due to an administrative oversight. Mobay decided to ship over one million dollars of product to Heartland in January 1986 because of Heartland's history of prompt payments. This decision was made with the knowledge that Heartland had not issued financial statements for the 1985 fiscal year and without talking to anyone at Heartland, any of Heartland's trade creditors, or any of Heartland's lenders. Union Carbide made its decision to ship approximately $236,000 of product to Heartland on December 17, 1985, with the knowledge that Heartland's line of credit had not yet been renewed and that the 1985 financial statements had not been issued. Union Carbide did not talk to anyone at Heartland before making its decision to ship product. Although Union Carbide did talk to Monsanto on December 17, 1985, Monsanto did not disclose the negative information it had about Ceres or that Monsanto had not yet decided whether to ship product to Heartland for the 1986 season. Elanco shipped $619,138.86 of inventory to Heartland between December 16, 1985, and January 6, 1986, after being told by the Bank on December 2, 1985, that the Heartland account was handled in a satisfactory manner. Elanco was not told that the line of credit had been renewed. Elanco learned from Mr. Timmons and Mr. Gibbens that Ceres and its affiliates had suffered significant losses. Elanco also knew that Heartland had not issued audited financial statements for 1985. Elanco did not talk to any other trade creditors. Thus, it is clear that the four creditors shipped product to Heartland at their own risk and not as a result of misrepresentations by the Bank.

52. Trade creditors made inventory protection payments to Heartland of over three million dollars in 1985. Virtually all of these payments were made in the summer and fall of 1985, long before the expiration of the Loan and Security Agreement and the alleged misrepresentations or inequitable conduct of the Bank. There was no connection between the decisions of the trade creditors to make inventory protection payments and any conduct or statements of the Bank. These payments were made to Heartland because Heartland was current on its accounts.

53. The Court was not impressed with the testimony of George Timmons. Mr. Timmons had the most to gain from a successful prosecution of this case. The trade creditors hold personal guaranties from Mr. Timmons and his company, Ceres Management Corporation. Thus far, the creditors have not taken action on these guaranties. In addition, Mr. Timmons has filed his own personal action against the Bank and its representatives. Despite this personal stake in this action, Mr. Timmons only agreed to help the Unsecured Creditors' Committee if they paid him $100 an hour for his assistance. He has been paid over $40,000.00 for his work in this case. The Court finds Mr. Timmons is not a credible witness.

54. Moreover, the Court finds the main reason for the failure of the Bank to renew Heartland's line of credit was the refusal of Mr. Timmons to sell his crops and farmland, and to comply with the conditions of the Bank. The Court viewed these conditions to be reasonable under the circumstances. Nevertheless, Mr. Timmons kept making additional demands on the Bank which sabotaged any chance of the Bank renewing the line of credit. Further, although Mr. Timmons was aware that the Loan and Security Agreement expired on November 30, 1985, and that the Bank was planning on getting out of the agribusiness field, Mr. Timmons did not take effective steps to replace the Bank with another lending institution. Indeed, Mr. Timmons vetoed the transfer of the line of credit to Wells Fargo on January 31, 1986, because of his personal conflict with Mr. Lewton. In addition, the record reveals little or no effort by Mr. Timmons to apprise Heartland's trade creditors of the precarious status of the line of credit with the Bank.

55. The Committee has attempted to portray Mr. Lewton as the main villain of the Bank's alleged fraudulent scheme to defraud the trade creditors, but the Court is not convinced of the accuracy of this characterization. It is true that Mr. Lewton had his shortcomings as a loan officer. One witness described him as a "caveman operating in the bank field"; another witness described Mr. Lewton as someone who was impressed with himself. Some of Mr. Lewton's language was brutally frank, such as his statement to Mr. Gibbens in late December of 1985 that he would "stick the suppliers" with the debt owed to the Bank if Mr. Timmons did not meet the conditions imposed by the Bank. There is no question that Mr. Lewton could have handled the Heartland account with more tact and sophistication. Nevertheless, the Court does not believe that Mr. Lewton concocted the whole scheme to defraud the trade creditors. Putting aside Mr. Lewton's personality, the evidence did not reveal any conduct on the part of Mr. Lewton that was inconsistent with his powers under the Loan and Security Agreement. Even his statement about sticking the suppliers was merely an accurate, albeit crude, prediction of what would happen if the line of credit was not approved. The Fifth Circuit could have been describing Mr. Lewton when they described the loan officer in *In re Clark Pipe & Supply Co., Inc.*, 893 F.2d 693, 701 (5th Cir.1990):

> Given the agreement he was working under, his testimony was hardly more than fanfaronading about the power that the agreement afforded him over the financial affairs of Clark. Although his talk was crass ... our careful examination of the record does not reveal any conduct on his part that was inconsistent with the loan agreement, irrespective of what his personal motive may have been.

## CONCLUSIONS OF LAW

1. The Bank did not exercise domination and control over the day-to-day operations of Heartland.

2. The conduct of the Bank was not inequitable as to the unsecured creditors of Heartland.

3. The Bank did not make any misrepresentations of existing fact to any of Heartland's trade suppliers.

4. The trade suppliers of Heartland did not reasonably and justifiably rely solely on the information they received from the Bank in deciding to extend credit to Heartland.

5. Even if the Court were to conclude that the Bank engaged in inequitable conduct, Heartland's trade creditors could not have been harmed by the Bank's conduct in an amount greater than $675,228.37 (the aggregate amount of the Elanco and Union Carbide shipments after the alleged misrepresentations of the Bank to these creditors, $854,179.46, less than 21% dividend already received by the creditors).

6. The Bank's claim should not be equitably subordinated to the claims of the unsecured creditors under 11 U.S.C. § 510(c)(1).

7. None of the transfers made by Heartland to the Bank within ninety days preceding the date of filing of Heartland's involuntary bankruptcy petition was an

avoidable preference under 11 U.S.C. § 547(b).

8. The Bank did not receive a greater percentage of its claim than it would have received under Chapter 7 because the Bank was fully secured at all relevant times. 11 U.S.C. § 547(b)(5).

9. The Bank was not an insider of Heartland for purposes of 11 U.S.C. § 547(b).

10. The Bank did not defraud Heartland as a result of any statements or omissions during the negotiation of the 1985 Loan and Security Agreement.

11. The Bank did not make any misrepresentations to Heartland regarding the extension or renewal of the 1985 Loan and Security Agreement.

12. The Bank's valid, first priority, secured claim against Heartland should be allowed in full.

## DISCUSSION

■ Section 510(c) of the Bankruptcy Code represents a general codification of the equitable power of a bankruptcy court to subordinate claims which existed under the Bankruptcy Act of 1898. *See In re Virtual Network Services Corp.*, 902 F.2d 1246 (7th Cir.1990); *In re CTS Truss, Inc.*, 868 F.2d 146 (5th Cir.1989). 11 U.S.C. § 510(c)(1) provides in pertinent part:

> (c) Notwithstanding subsections (a) and (b) of this section, after notice and hearing, the court may—
> (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or part of an allowed interest to all or part of another allowed interest
> . . .

Section 510(c) does not provide criteria for the exercise of this power of equitable subordination. Therefore, the Court must work out equitable subordination issues in "common law fashion". *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1356 (7th Cir.1990); *Burden v. United States*, 917 F.2d 115, 118 (3rd Cir.1990).

*In re Mobile Steel Co.*, 563 F.2d 692, 703 (5th Cir.1977), a case decided shortly before the enactment of the Bankruptcy Code, the Fifth Circuit sets forth the widely accepted three-prong standard for equitable subordination: (1) the claimant must have engaged in some type of inequitable conduct; (2) the misconduct must have resulted in injury to the creditors or conferred an unfair advantage on the claimant; and (3) equitable subordination of the claim must not be inconsistent with the bankruptcy law. *See Kham & Nate's, supra,* 908 F.2d at 1356; *Koch Refining v. Farmers Union Central Exchange, Inc.,* 831 F.2d 1339, 1351, n. 13 (7th Cir.1987), *cert. denied,* 485 U.S. 906, 108 S.Ct. 1077, 99 L.Ed.2d 237 (1988); *In re Badger Freightways, Inc.,* 106 B.R. 971, 976 (Bankr.N.D.Ill.1989).

Usually, equitable subordination of claims has been directed at insiders of the debtor or those who stood in a fiduciary relationship with the debtor, in order to prevent them from transposing their equity interests into claims or from improving the priority position of their claims. *Kham & Nate's, supra,* 908 F.2d at 1356. However, it has not been restricted in its application exclusively to insider or fiduciary claims. *In re CTS Truss, Inc., supra,* 868 F.2d at 148–49. Equitable subordination has also been applied to those cases in which a third party controls the debtor to the disadvantage of others or a third-party defrauds other creditors. *Pepper v. Litton,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939); *In re American Lumber Co.,* 5 B.R. 470 (D.Minn.1980); *In re Bowman Hardware & Electric Co.,* 67 F.2d 792 (7th Cir.1933). Under these latter circumstances, the conduct necessary for subordination must be "egregious and severely unfair in relation to the other creditors." *In re Giorgio,* 862 F.2d 933, 939 (1st Cir.1988). As one court observed, "a non-fiduciary claimant can act strategically to protect its interest to the potential detriment of similarly situated claimants," but a fiduciary cannot afford this luxury. *In re Badger Freightways, Inc., supra,* 106 B.R. at 976.

■ The distinction between the subordination of claims of insiders as opposed

to creditors is also important for purposes of the burden of persuasion and the extent of evidence needed to justify equitable relief. The underlying burden of persuasion placed upon the plaintiff is the same; the plaintiff must justify equitable subordination by a preponderance of the evidence. *In re Pinetree Partners, Ltd.*, 87 B.R. 481, 488 (Bankr.N.D.Ohio 1988); *In re Teltronics Services, Inc.*, 29 B.R. 139, 169 (Bankr. E.D.N.Y.1983). However, dealings between the debtor and its fiduciaries are subject to closer scrutiny, *In re Bellanca Aircraft Corp.*, 850 F.2d 1275, 1282 n. 13 (8th Cir.1988); *In re Ludwig Honold Mfg.*, 46 B.R. 125, 128 (Bankr.E.D.Pa.1985), which means the inequity must be clear for subordination of a noninsider claim. Moreover, once some inequity is demonstrated vis-a-vis an insider, the insider then has the burden of demonstrating the underlying fairness of the transaction. *In re Holywell Corp.*, 913 F.2d 873, 880–81 (11th Cir.1990); *In re Missionary Baptist Foundation of America*, 712 F.2d 206, 212 (5th Cir.1983).

■ Since equitable subordination results in an alteration of an entity's creditor relationship with the debtor, courts consider the manner in which the challenged creditor transaction arose. The more arm's length or *bona fide* the transaction, the less possibility of its inequitability. As the Seventh Circuit recently observed, "Cases subordinating the claims of creditors that dealt at arm's length with the debtor are few and far between." *Kham & Nate's, supra*, 908 F.2d at 1356.

■ A financial lending institution like the Bank does not generally owe fiduciary obligations to the customers to whom it lends. *In re W.T. Grant Co.*, 699 F.2d 599, 609 (2d Cir.), *cert. denied*, 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983). As the Seventh Circuit stated in *In re Prima Company*, 98 F.2d 952, 965 (7th Cir.), *cert. denied*, 305 U.S. 658, 59 S.Ct. 357, 83 L.Ed. 426 (1938):

> Aside from the provisions of the bankruptcy law, a creditor has a right to call a loan when due and to lawfully enforce collection. He may refuse an extension for any cause which may seem proper to

him, or even without any cause. The law provides certain means for the enforcement of claims by creditors. The exercise of those rights is not inherently wrongful.

More recently, the Seventh Circuit has re-emphasized a lender's freedom to exercise the rights and privileges accorded the lender under its agreement with a borrower. *In re EDC, Inc.*, 930 F.2d 1275, 1281–82 (7th Cir.1991); *Kham & Nate's, supra*, 908 F.2d at 1356–57.

■ An exception to the general rule that a lending institution is under no fiduciary obligation to its borrower or to other creditors exists when the lending institution exerts dominion and control over its customers. A lending institution is held to a fiduciary standard only when it usurps the customer's ability to make business decisions. *In re Badger Freightways, Inc., supra*, 106 B.R. at 977. In effect, the lending institution must become the alter ego of the customer before it can be held to a fiduciary standard. *In re Teltronics, supra*, 29 B.R. at 171. "What is required is operating control of the debtor's business, because only in that situation does a creditor assume the fiduciary duty owed by the officers and directors." *In re Badger Freightways, Inc., supra*, 106 B.R. at 977. *See In re Clark Pipe & Supply Co., Inc., supra*, 893 F.2d at 701 (Equitable subordination appropriate where lender exercises "such total control over the debtor as to have essentially replaced its decision-making capacity with that of the lender.")

In the instant case, the Bank did not exercise the dominion and control over the day-to-day management of Heartland which would make the Bank a fiduciary of Heartland. The Bank did not own any stock in Heartland or place any of its employees as either a director or an officer of Heartland. The Bank did not influence the removal from office of any Heartland officers. The Bank did not make management decisions for Heartland. The Bank did not dictate to Heartland which bills to pay. Heartland handled its own daily operations and controlled its inventory purchases.

■ The Bank did not coerce Heartland into executing the Loan and Security Agreement. Heartland was solvent at the time of the signing of the Loan and Security Agreement. The Loan and Security Agreement was the product of arm's length negotiations between the Bank and Heartland. Heartland was represented by experienced counsel at all relevant times during the negotiation of the Loan and Security Agreement. Six months of discussions between the parties preceded the signing of the Loan and Security Agreement on May 15, 1985, and several substantive loan provisions were changed from the initial draft loan agreement. Heartland only signed the Loan and Security Agreement after its attorney signed an opinion letter certifying, among other things, the validity and enforceability of the agreement's provisions.

■ The Bank's activities were conducted pursuant to the Loan and Security Agreement. The Bank's close scrutiny of Heartland's financial affairs, especially after the borrowing base certificates began to show negative margins, does not justify equitable subordination. "There is nothing inherently wrong with a creditor carefully monitoring his debtor's financial situation or with suggesting what course of action the debtor ought to follow." *In re Clark Pipe & Supply Co., Inc., supra,* 893 F.2d at 702, quoting *In re Teltronics Services, Inc., supra,* 29 B.R. at 172.

The Loan and Security Agreement expired by its own terms on November 30, 1985. Earlier that fall, the Bank had decided to withdraw from agricultural lending in the United States. Nevertheless, the Bank continued to advance funds to Heartland through the end of the year. In addition, the Bank continued to negotiate with Heartland regarding short-term financing. However, the Bank was not obligated under the Loan and Security Agreement to continue to advance funds to Heartland after November 30, 1985, or to negotiate with Heartland regarding future financing. The Bank was free to walk away from Heartland after November 30, 1985. As

the Seventh Circuit recently observed in *Kham & Nate's, supra,* 908 F.2d at 1358:

Although Bank's decision [to cease making further advances] left Debtor scratching for other sources of credit, Bank did not create Debtor's need for funds, and it was not contractually obliged to satisfy its customer's desires. The Bank was entitled to advance its own interests, and it did not need to put the interests of Debtor and Debtor's other creditors first.

Moreover, the Bank was entitled to enforce its security interests in the assets of Heartland pursuant to the terms of the Loan and Security Agreement. *In re EDC, Inc., supra,* 930 F.2d at 1282.

■ Perhaps the strongest evidence that the Bank did not exercise dominion and control over Heartland can be found in the actions of Mr. Timmons and Mr. Huisinga who repeatedly disregarded the advice of the Bank from the inception of the credit relationship. For example, Heartland's affiliates never executed intercompany notes to reflect their borrowings from Heartland, despite Mr. Lewton's suggestions dating from at least the Bank's April 2, 1984, commitment letter and despite Mr. Timmons' written consent to such letter. Heartland ignored Mr. Lewton's repeated request for a lockbox in the Bank's name in which to deposit Heartland's collections and accounts receivable. In addition, Mr. Timmons and Mr. Huisinga disregarded Mr. Lewton's repeated suggestions to significantly reduce or eliminate the indebtedness of Ceres. Mr. Timmons and Mr. Huisinga also repeatedly resisted pledging new assets to the Bank or selling assets such as crops and farmland which Mr. Lewton had requested as early as October 1984. Thus, it is clear that Heartland never lost its power to act autonomously.

■ Although the Bank was not a fiduciary of Heartland, its claim may still be equitably subordinated if the Bank engaged in "gross misconduct tantamount to fraud, overreaching or spoliation to the detriment of others". *In re Badger Freightways, supra,* 106 B.R. at 976, quoting *In re Teltronics, supra,* 29 B.R. at 169. How-

ever, the evidence in this case falls far short of the type of egregious conduct that is necessary to justify the remedy of equitable subordination.

The lending relationship between the Bank and Heartland was governed by a financing agreement negotiated at arm's length between two sophisticated commercial parties with the advice of counsel. The Bank did not breach the terms of the financing agreement with Heartland. The Bank never turned down a loan request from Heartland during the term of the Loan and Security Agreement, nor at any time thereafter. In fact, beginning in early August of 1985, the Bank made several overadvances to Heartland even though the Bank was under no obligation to do so and the borrowing base certificates reflected negative margins.

The Bank's request for additional collateral and security was not unreasonable. As the Seventh Circuit recently noted, "A bank may insist on security before lending." *Kham & Nate's, supra,* 908 F.2d at 1358.

The Bank had no duty to either finance Heartland beyond the expirations of the 1985 Loan and Security Agreement or to renew or extend the agreement. Despite the lack of any contractual obligation to do so, the Bank made four separate advances to Heartland between November ·30, 1985, and January 10, 1986, in the aggregate amount of $385,000.00. Moreover, the Bank made a good faith attempt to negotiate a proposed short-term extension of Heartland's line of credit during the first few months of 1986.

■ The Court heard a lot of evidence about the Bank's decision to withdraw from the agricultural lending field and, more specifically, on the Bank's decision not to renew the Heartland line of credit and the effect of this decision on Heartland and its creditors. This evidence, however, was legally irrelevant to the question of whether the Bank's conduct was sufficiently unconscionable to warrant equitable subordination. As the Seventh Circuit made clear in *Kham & Nate's,* as long as a lender's decision to cease making further advances is consistent with its contractual rights, it can do so "for any reason satisfactory to itself". 908 F.2d at 1357.

■ It may be true, as the Committee asserts, that the Bank's decision not to renew the Heartland line of credit left Heartland without any available line of credit, propelled Heartland into bankruptcy, and destroyed Heartland's going concern value. However, as in *Kham & Nate's,* the Bank did not create Heartland's need for funds, and it was not contractually obligated to satisfy this need. 908 F.2d at 1358. Heartland had ample advance notice of the termination and opportunity to find a lender to replace the Bank, but failed to do so. The Bank cannot be blamed for Heartland's failure to procure a new lender.

■ The final component of the Committee's equitable subordination claim is that the Bank defrauded several of Heartland's trade creditors. The evidence, however, showed that the Bank did not make misrepresentations of existing fact to any of Heartland's trade suppliers. More particularly, it was not improper, unreasonable, or inaccurate for the Banks loan officer to characterize the Heartland account as "satisfactory" in December 1985. Although the Loan and Security Agreement expired on November 30, 1985, over $5,000,000 in loans to Heartland were still outstanding, Heartland had been regular in its payments, and the Bank was awaiting the 1985 financial statements. Moreover, the Bank itself continued to loan funds to Heartland through January 1986 and to negotiate a renewal of the line of credit through the spring of 1986. Under these circumstances, it was not a misrepresentation of existing fact to describe the Heartland account as satisfactory.

■ Further, the trade creditors who allegedly received the fraudulent information from the Bank did not reasonably and justifiably rely solely on the information they received from the Bank in deciding to extend credit to Heartland. The trade creditors are some of the world's largest and most sophisticated chemical manufac-

**520**

turing conglomerates. They regularly conducted business with Heartland since the 1970's. These trade creditors regularly received information, including Heartland's payment history, financial statements, contacts with Heartland's principals, actual visits to Heartland, contacts with other trade creditors, contacts with Heartland's banks, and various credit reports.

No audited financial statement was issued for Heartland for the fiscal year ending July 31, 1985. This failure to issue a financial statement should have been a "red flag" to the trade suppliers. Monsanto, for instance, made a business decision in December of 1985 to cease making additional shipments to Heartland after it learned of the failure to issue the financial statement and other negative information, including losses at Heartland's affiliates. Heartland's other trade creditors, particularly Elanco, BASF, and Union Carbide, were either aware of this information or had access to the information, but decided to ship products anyway. They did so at their own risk. The creditors could not have reasonably and justifiably relied solely on very brief telephone calls to the Bank in deciding to ship inventory in light of the readily available negative credit information about Heartland.

■ In any event, even if the Court were to conclude that the Bank engaged in inequitable conduct sufficient to warrant the remedy of equitable subordination, the Bank's inequitable conduct would render only the relative improvement of the Bank's position as fairly subject to equitable relief. *In re Westgate–California Corp.*, 642 F.2d 1174, 1178 (9th Cir.1981) (Subordinations limited to the extent of harm caused by the inequitable conduct); *In re Osborne*, 42 B.R. 988, 1000 (W.D.Wis. 1984). The damage caused is limited to the additional unsecured credit offered to Heartland which redounded to the Bank's benefit, and relief can be afforded only to those creditors who suffered at the Bank's expense. *In re Bowman Hardware & Electric Co.*, 67 F.2d 792 (7th Cir.1933) (Absence of evidence that other creditors were damaged by inequitable conduct is

fatal to the asserted priority of all other general creditors); *In re Mayo*, 112 B.R. 607, 651–52 (Bankr.D.Vt.1990) ("No harm, no foul"); *In re Just For the Fun of It*, 7 B.R. 166, 180–81 (Bankr.E.D.Tenn.1980) (Creditor's claim subordinated to those creditors who extended credit in reliance upon the inequitable conduct).

■ Under the "no harm, no foul" rule, the Bank's claim can only be subordinated to the extent of the actual harm suffered by the individual trade creditors of Heartland as a result of the Bank's alleged inequitable conduct. The Bank's claim cannot be subordinated to the unsecured claims of Heartland's trade suppliers who had no contacts with the Bank, the inventory protection claims of the trade suppliers, or the unsecured claims of the trade suppliers who had communications with the Bank after they shipped inventory to Heartland. The actual harm suffered by Heartland's trade creditors can only be measured by the amount of chemical inventory actually shipped by trade creditors after the Bank's purported misrepresentations, and for which payment was never received. Here, only Elanco and Union Carbide made actual shipments of additional chemical inventory to Heartland after the alleged misrepresentations of the Bank. The aggregate amount of these shipments was $854,719.46. However, since Elanco and Union Carbide (like Heartland's other trade creditors) received an initial distribution equal to 21% of their claims, the Bank's claim could only be subordinated, if at all, to the extent of $675,228.37 (*i.e.*, the sum of $854,719.46 reduced by 21%).

In sum, the Bank's conduct was not sufficiently inequitable under any standard to justify the subordination of its claim under 11 U.S.C. § 510(c).

■ Next, the Committee asserts that transfers made by Heartland to the Bank within the ninety days preceding the filing of the bankruptcy petition are avoidable preferences under 11 U.S.C. § 547(b). This argument is premised on the subordination of the Bank's secured claim to Heartland's unsecured creditors. Since this Court has rejected the subordination of the Bank's

claim, the Bank's status as a fully secured creditor precludes a finding that it would have received less in payment of its claim through a Chapter 7 liquidation of Heartland's assets. 11 U.S.C. § 547(b)(5). Therefore the preference claim must be denied.

█ The Committee next seeks to recover damages from the Bank on a theory of common law fraud. This fraud claim is based on an alleged "scheme to defraud" that consisted of the Bank's use of Heartland as an instrument to effect the Bank's plan to convert the trade suppliers' assets to the Bank's use. According to the Committee, there were two prongs to this fraudulent scheme: First, the Bank made intentional and material misstatements and omissions to Heartland to induce Heartland to remain in operation long enough to bring in additional inventory for the 1986 selling season. Second, the Bank contemporaneously defrauded Heartland's trade suppliers to induce them to provide Heartland with the additional inventory that would insure the Bank of a fully secured position. The Court has previously rejected the second prong of this argument, and the Court now finds the first prong of the argument to be equally without merit.

█ In order to establish a case of common law fraud in Illinois, a plaintiff must prove by clear and convincing evidence (i) a false statement of material fact; (ii) known or believed to be false by the party making it; (iii) intent to induce the other party to act; (iv) action by the other party in reliance on the truth of the statement; and (v) damage to the other party resulting from such reliance. *Consolidated Bearings Co. v. Ehret–Krohn Corp.*, 913 F.2d 1224, 1227 (7th Cir.1990); *West v. Western Casualty & Surety Co.*, 846 F.2d 387, 393 (7th Cir.1988).

The Bank did not defraud Heartland as a result of any statements or omissions during the negotiation of the 1985 Loan and Security Agreement. Any statements by the parties during the negotiation of the Loan and Security Agreement that might have been inconsistent with the final written terms and conditions of the final draft are legally irrelevant and cannot be the source of a fraud claim. *See, Runnemede Owners, Inc. v. Crest Mortgage Corp.*, 861 F.2d 1053, 1059 (7th Cir.1988). Heartland's rights and obligations were governed exclusively by the terms and conditions of the Loan and Security Agreement once it was executed by the parties on May 15, 1985. Thus, Heartland could not have reasonably relied on any alleged statement or conduct of the Bank prior to May 15, 1985, that was inconsistent with the express written terms of the 1985 Loan and Security Agreement which Heartland executed with the advice of counsel.

█ Moreover, the Committee failed to prove that the Bank made any misrepresentations to Heartland regarding the extension or renewal of the 1985 Loan and Security Agreement. The evidence showed that the Bank was willing to extend a short term line of credit to Heartland if certain terms discussed in the Bank's letters to Heartland dated August 8, 1985, August 20, 1985, January 22, 1986, and February 13, 1986, were met. Most of these terms were not satisfied by Heartland.

Furthermore, the Committee failed to prove that Heartland reasonably and justifiably relied on any such alleged misrepresentation. Heartland knew that Mr. Lewton did not have independent lending authority, and that credit approval was required from the Bank's Paris office. Heartland also knew that the 1985 Loan and Security Agreement provided that the agreement could not be extended unless there was a "written agreement" by the parties. In the fall of 1985, Heartland was advised that the Bank was going to withdraw from agricultural lending in the United States, and that although the Bank might renew the line of credit, such renewal would not be automatic. Heartland was also aware that the Bank was not interested in renewing the line of credit unless various conditions which were outlined in letters to Heartland beginning in August of 1985 were met. Heartland knew that most of these conditions were not satisfied. Thus, it is clear that Heartland was fully aware that there was strong probability

**522**

that the Bank would not renew its line of credit.

One final matter remains. The Committee has objected to the allowance of the Bank's secured claim. In light of the foregoing, the Bank's valid, first priority, secured claim against Heartland should be allowed in full.

For the foregoing reasons, the Court finds in favor of Banque Paribas and against the Unsecured Creditors' Committee on Counts I, II, and IV of the Complaint. The Court further finds that the secured claim of Banque Paribas should be allowed in full.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.